# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00307-CR

**Guadalupe Vasquez, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT NO. 3030048, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING

## O P I N I O N

A jury convicted Guadalupe Vasquez of murder, and he was sentenced to fifty years in prison. *See* Tex. Pen. Code Ann. § 19.02 (West 2003). In this appeal, Vasquez raises four points of error, all with respect to the admission and consideration of his extra-judicial confession.[1] Although we hold that the trial court did not err by finding that Vasquez's confession had been voluntarily made, it was error to refuse Vasquez's request to submit the issue of voluntariness to the jury. We reverse the conviction and remand for a new trial consistent with this opinion.

---

[1] Vasquez's brief lists five points of error, but the fifth point is simply a statement that the errors in the case harmed him and that the case must be remanded for a new trial.

## BACKGROUND

Gary Jackson was found dead in his home on January 5, 2003. He had been shot twice in the chest and once in the head, and a plastic bag had been placed over his head. Jackson was Vasquez's landlord and lived on the other side of the duplex occupied by Vasquez and his wife Maria. Detective Kerry Scanlon briefly spoke with the couple outside of their home on the evening of January 8, and they were later asked to come to the police station for an interview. At that time, Vasquez was already a suspect in light of reports by neighbors that Vasquez and Jackson had argued loudly and a ledger found in Jackson's home indicating that Vasquez owed Jackson several thousand dollars. Guadalupe and Maria Vasquez drove to the police station the following afternoon and were interviewed separately.

Because the voluntariness of Vasquez's confession is at issue, a detailed description of the over seven hours of interrogation leading up to the confession is helpful. After Vasquez and his wife arrived at the police station, Detective Scanlon placed Vasquez alone in a small interview room. The room contained only a small table and several plastic chairs. A hidden overhead camera recorded all activities in the room. The videotape of the interview indicates that Vasquez was placed in the room at 4:54 p.m. Detective Scanlon soon began the interview by asking Vasquez about his whereabouts over the past weekend, his relationship with Jackson, and when he last saw Jackson. Over the course of the next hour, Scanlon took down Vasquez's account on a computer and produced an affidavit, which Vasquez signed. In the affidavit, Vasquez stated that he last saw Jackson outside of the duplex on the evening of Friday, January 3 when he and his wife were going out to eat. He gave a general description of what he and his wife did over the weekend. Vasquez stated that he

2

learned of Jackson's death when he returned from the store on Sunday, January 5, to find police at the duplex.

Once Detective Scanlon took down Vasquez's statement, he left the room to go print it out. He told Vasquez that the door was not locked, but that if he needed to go to the bathroom to just knock.[2] Scanlon then took Vasquez to the bathroom and can be seen in the video escorting him back to the interview room and leaving. Vasquez was handed the written statement and given time to review it. Vasquez signed the statement, and Scanlon notarized it and took a photograph of Vasquez. Scanlon then left, saying that he would check on Vasquez's wife.

Vasquez was left alone in the interview room for about twelve minutes. During that time, he can be seen yawning, stretching, rubbing his eyes, and fidgeting. When Scanlon returned, he informed Vasquez that his wife would be a while longer because of "language problems." Scanlon then moved his chair close to Vasquez, crowding him in the far corner of the interview room. Vasquez remained seated in this corner throughout the interrogation. Detective Eric De Los Santos later entered the room and joined the interrogation. At this point, the interrogation became somewhat more direct. Vasquez was asked about guns that he possessed, when he last used them, and whether he would allow police to test them. He was asked in detail about the interior of Jackson's home and whether Vasquez's fingerprints, hair, or tools would be found there. Vasquez admitted that he had taken some trash bags from his job and that he might have given some to

---

[2] The State acknowledges in its brief that "it is reasonable to surmise that it is standard police department procedure for a civilian visitor to be accompanied by an officer when walking through the building. It is unlikely that visitors would be allowed to wander around the police department without being accompanied by an officer for security reasons."

Jackson. The conversation also focused on Vasquez's employment at a funeral home. There was a lengthy discussion of how the heads of bodies are bagged after autopsies. At times the officers joked with each other that Vasquez did not want to talk about the bagging of the head on a body. Vasquez was also told that neighbors had reported arguments between him and Jackson and that he owed Jackson several thousand dollars.

After about an hour, the detectives became even more insistent:

Scanlon:    I think you have a story to tell, you need to start telling the story.

Vasquez:    I don't have a story.

Scanlon:    I think you do. I think you need to tell us your side of what happened.

Vasquez:    My side of what happened?

Scanlon:    If you want us to know your side of what happened, you're the only one who can tell us that.

Vasquez was then informed that owing money to Jackson was "the least of his problems." Detective De Los Santos asked, "what happened—seriously now—you've been playing games this whole time . . . what happened?" In response to a direct question, Vasquez denied killing Jackson.

At 7:18 p.m., after he had agreed to go to his home with the detectives to examine his .38 revolver, Vasquez asked, "where's my wife?" He was informed that she was still speaking with other detectives. As the detectives got up from their chairs, Vasquez said, "I need to get my wife." He was told by Detective De Los Santos that the detectives were going in their own car and that he should wait in the interview room. Five minutes later, Scanlon returned. Vasquez asked if his wife was ready. Scanlon replied, "I didn't even notice." After setting up his computer, Scanlon told

4

Vasquez, "I hate to see you try to stick to this story," and then continued pressing Vasquez to admit his guilt. The interrogation continued along these lines for another half hour until Vasquez asked to go out to smoke a cigarette.[3] As they left the interview room, Vasquez again asked, "where's my wife?" No response from the detectives can be heard on the videotape.

After they returned from the cigarette break, Vasquez was offered water, which he declined. At 8:10 p.m. Vasquez asked Scanlon, "Is my wife still in the building . . . can I see her?" Scanlon replied that Vasquez could but asked Vasquez to wait a second while Scanlon continued working on his computer. Scanlon then proceeded to discuss computers until an officer arrived to take hair and saliva samples from Vasquez. Shortly thereafter, Vasquez consented to a search of his car. When he asked to accompany the officers in searching his car, De Los Santos stated, "Technically, you can't go out, I mean, we'd like to do it ourselves." The detectives then got up to leave. As they were leaving, Vasquez again asked about his wife:

> Vasquez: Where's my wife at?
>
> Scanlon: She's right over there.
>
> Vasquez: I'd like to talk to her.

Vasquez's request was ignored, and the detectives left the room. Upon Scanlon's return, Vasquez again asked, "so where's my wife at?" Scanlon told Vasquez that she was "out there" and that he would probably bring her in a minute and let the two wait together. He then resumed pressing Vasquez to admit to the murder explaining, "I will not be able to help you later. . . . I'm trying to

---

[3] Vasquez stated, "Let's go smoke a cigarette . . . . I think I have a right to that."

be on your side. . . . I'm trying to help everybody out." Vasquez continued asking about his wife but was told that she was still talking to the detectives. Scanlon informed Vasquez that "she's got a lot to say" and that she had changed her story. At 8:41 p.m., Vasquez was given some water. Soon after, he was told that the police had obtained a warrant to search his house, "based on the evidence."

The interrogation continued in much the same way over the course of the evening. The officers revisited many of the same areas of inquiry, confronted Vasquez with alleged inconsistencies between his statements and facts already known to the police, and even asserted that Vasquez's wife had helped him commit the murder. At 9:31 p.m., Vasquez was allowed to use a phone to call his wife. Vasquez called his home but there was no answer, and Detective Scanlon told Vasquez that no one would answer at the house.

On several occasions Vasquez asked to leave. Each time, the detectives either ignored his requests and changed the subject or gave an off-putting excuse to delay Vasquez. At 9:23 p.m., Vasquez asked if he could go home. Detective Scanlon replied that he could go home but that he could not go inside because the police were searching the house. "Right now, all we can do is wait. When they advise us, I'll let you know." At 9:45 p.m., Vasquez told Detective De Los Santos that he was ready to go:

De Los Santos: What's the word Lupe?

Vasquez: Well, I'm ready to go now.

De Los Santos: You ready to go now?

Vasquez: Oh yeah.

De Los Santos: You want to go now?

6

Vasquez:          Oh yeah.

De Los Santos:  You don't want to hang around no more?

Vasquez:          Well, I gotta get up early in the morning.

De Los Santos:  Ok.  I talked to your wife . . . .

At the end of this exchange, Detective De Los Santos sat down in one chair and put his feet up on another—effectively blocking the door—and proceeded to ask Vasquez about possible inconsistencies between his story and that of his wife.  Vasquez remained seated in the corner of the room and continued to answer questions.

Vasquez inquired about the status of his truck at 10:14 p.m.  Detective De Los Santos replied that he did not know.  When Vasquez complained about being interrogated, Detective De Los Santos replied, "You don't have to be here, you know, you are free to leave any time you want to . . . but, I guess my concern would be . . . I'm not, you know, I'm not going to beat around the bush with you, I'm going to ask you straight up—did you kill Gary?"  Vasquez denied killing Jackson, and the interrogation continued.

At 10:29 p.m., Vasquez announced that it was "time to go now."  He was asked several more times whether he had anything else to say.  Detective Scanlon then gave Vasquez his business card and went to retrieve Vasquez's car keys.  Standing by the open door, Detective De Los Santos continued to press Vasquez about his involvement in the murder.  Then Detective Scanlon asked the two to wait a second.  Vasquez agreed and returned to his seat in the far corner.  He told Detective De Los Santos that he needed to call his wife.  Detective De Los Santos replied that he was sure she was alright and continued to question Vasquez.  Detective Scanlon returned with a bag and

asked Vasquez to put his boots in it.  Vasquez complied.  Detective Scanlon took the boots away, and Vasquez asked Detective De Los Santos:

> Vasquez: How am I supposed to leave?  How long are you going to keep the boots?
>
> De Los Santos: I'm telling you man, we are going to find it.  We are going to find it. If there's an explanation, you need to tell me.
>
> Vasquez: How am I supposed to work without my boots?
>
> De Los Santos: Hmm?  You don't have any other shoes?
>
> Vasquez: I have other work boots.
>
> De Los Santos: But that's not what we are talking about here.  Is, is that really what concerns you is how you going to work without those shoes?. . . . I don't think that's the only thing you are worrying about.  I doubt that's your main worry right now. . . .  Because we're going to find it man.
>
> Vasquez: Where are they going to take my boots?
>
> De Los Santos: Help yourself man. Make your self feel better . . . .
>
> Vasquez: And they're in my house right now.

Detective De Los Santos then told Vasquez again that he was free to leave; his car keys had been placed on the table in front of him.  However, Vasquez was also told that he could not go home until the police finished searching his house.  Vasquez remained seated without his boots and the detectives continued to interrogate him with the door open.

At 11:36 p.m., Vasquez asked to leave one final time:

8

Vasquez:         Ya me voy? (I am going now?)[4]

De Los Santos:  That's up to you.  That's up to you.

Vasquez:         Soy descalzo. (I am shoeless.)[5]

De Los Santos:  Descalzo man, you know what . . . .

Vasquez:         That's the least of my worries.

De Los Santos:  That's the least of your worries. . . unless there are other worries.

Vasquez:         That's all I have man.

De Los Santos:  Hey brother, I'm not holding you back . . . but does it bother you
                that I don't believe you?

Detective De Los Santos then continued in his attempt to persuade Vasquez to tell the truth while Vasquez remained seated in his chair in the corner of the room.

        The conversation leading up to Vasquez's confession turned to his problems with depression.  Vasquez told the detectives that he had taken medication for depression and that he had been treated by a neurologist.  He said that his doctor stopped prescribing the medication and that he had been taking some of his wife's medication.  He informed the detectives that he almost committed suicide several times and admitted that he had problems controlling his anger without the medication.  He described his feelings as "worse than anger."  Vasquez twice asked to take a cigarette break during this conversation.  He first agreed to wait five minutes.  In response to his second request, Vasquez was told he could have a cigarette if he told the truth.  During this final

---

[4] *See* New Revised Velasquez Spanish and English Dictionary 682 (1985) ("*Ya voy*, I am going, or I am going presently.").

[5] *See id*. at 240 (*descalzo*, barefooted or shoeless).

9

conversation, the detectives repeatedly told Vasquez that they wanted to help him but could not do anything for him unless he told the truth about the murder. When asked whether he wanted to hurt anyone else, Vasquez indicated that he wanted to hurt himself. The detectives then discussed Vasquez's need for medication:

Scanlon:         You need medication, We can get you some medication. Tell us what happened . . . if you tell us the truth of what happened, you know, we're gonna do everything we can to get you the help you need.

De Los Santos: We can't help you if you don't help yourself.

Vasquez:        I know.

After several more minutes of pressing Vasquez to tell him what happened, Detective Scanlon reached out his hand to Vasquez. Vasquez held Scanlon's hand and said, "It happened." After answering a couple questions about how he went inside Jackson's home and repeating that he "did it," Vasquez again took Scanlon's hand. Scanlon reassured Vasquez, "I'm on your side . . . I still am your friend. I still like you." Vasquez wiped tears from his eyes, and they all got up for Vasquez to have a cigarette. Detective Scanlon testified at trial that they went for a cigarette "because [Vasquez] was crying and I wanted to reward him for making the admission." Scanlon later returned to the interview room with Vasquez, who gave a full account of the murder. Scanlon first informed Vasquez of his *Miranda* rights at 12:27 a.m. Vasquez was later taken out to Jackson's home where he reenacted the murder.

Prior to trial, Vasquez filed a motion to suppress his confession. A hearing was conducted in which the district court heard testimony from Detective Scanlon and watched the

10

videotape of the interrogation. The district court overruled the motion and the confession, including the entire videotaped interrogation, was admitted at trial.

**DISCUSSION**

Vasquez raises four points of error with regard to the district court's handling of his confession: the district court (1) did not properly enter findings of fact and conclusions of law as required by article 38.22, section 6 of the code of criminal procedure; (2) erred by overruling his motion to suppress the confession because his confession was not voluntarily made; (3) erred by overruling his motion to suppress the confession because Vasquez did not voluntarily waive his rights as required by article 38.22, section 2 of the code of criminal procedure; and (4) erred by failing to submit the issue of the voluntariness of Vasquez's confession to the jury.

**Findings of Fact and Conclusions of Law**

In his first point of error, Vasquez contends that the trial court failed to enter findings as required by article 38.22, section 6, of the code of criminal procedure. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 6 (West 2005). When the voluntariness of a statement is challenged, a trial court is required to make findings with regard to its determination. *Id.*; *Urias v. State*, 155 S.W.3d 141, 142 (Tex. Crim. App. 2005). Such findings are mandatory even when there is no objection at trial. *Id.* However, a trial court will be found to have complied with article 38.22, section 6, if the court dictates its findings and conclusions to the court reporter and those findings are made part of the appellate record. *See Murphy v. State*, 112 S.W.3d 592, 601-02 (Tex. Crim. App. 2003); *Parr v. State*, 658 S.W.2d 620, 623 (Tex. Crim. App. 1983). "[F]indings need not be made with minute

11

specificity as to every alleged and hypothetical possibility for physical or mental coercion, but need only be sufficient to provide the appellate court and the parties with a basis upon which to review the trial court's application of the law to the facts." *Nichols v. State*, 810 S.W.2d 829, 831 (Tex. App.—Dallas, 1991, pet. ref'd).

Here, the district court read its findings into the record:

> The Court finds that the accused, Guadalupe Vasquez, voluntarily went to the Austin Police Department for an interview, he and his wife. The Court is capable of finding that based upon the evidence the Court heard at the hearing. The Court finds that the defendant during his lengthy session in the interview room appeared to be alert at all times. He was given opportunities to take breaks, breaks upon his request. From the Court's observations in viewing the videotape, the door to the interview room was never locked. In fact, as the lawyers have indicated, the door was opened at a point in time during the interview of the accused. The defendant was told on at least two occasions that he was free to leave if he wished to leave. But he didn't exercise that desire if he had one. He never attempted to leave and the Court finds that there were no restrictions or any actions that the Court was able to view that would prohibit or interfere with an opportunity to leave the interview room. His car keys were made available to him.
>
> The Court finds that the defendant freely and voluntarily waived his rights, although the Court also finds, as I said earlier, this was a noncustodial interrogation and the motion to suppress is denied.

The district court's findings make specific reference to facts adduced through testimony at the hearing and events on the videotape. We hold that these findings were properly read into the record and are sufficiently detailed to comply with the requirements of article 38.22, section 6. *See Murphy*, 112 S.W.3d at 601-02; *Nichols*, 810 S.W.2d at 831. Accordingly, we overrule Vasquez's first point of error.

12

**Voluntariness**

In his second and third issues, Vasquez contends that the district court erred by admitting his confession because both his confession and his waiver of his *Miranda* rights were the result of police coercion, and therefore were not voluntarily made. *See* Tex. Code Crim. Proc. Ann. art. 38.22; *Blackburn v. Alabama*, 361 U.S. 199, 210 (1960). In reviewing a ruling on a motion to suppress, we give almost total deference to the trial court's determination of historical facts. *See Balentine v. State*, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002); *Garcia v. State*, 15 S.W.3d 533, 535 (Tex. Crim. App. 2000). We review *de novo* mixed questions of law and fact that do not turn on an evaluation of credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *Hayes v. State*, 132 S.W.3d 147, 151 (Tex. App.—Austin 2004, no pet.). The district court is the sole fact-finder at a *Jackson v. Denno* hearing and may choose to believe or disbelieve any or all of the witnesses' testimony. *Sells v. State*, 121 S.W.3d 748, 767 (Tex. Crim. App. 2003); *Dewberry v. State*, 4 S.W.3d 735, 747-48 (Tex. Crim. App. 1999). We are not at liberty to disturb any finding that is supported by the record. *Sells*, 121 S.W.3d at 767.

Vasquez asserts that he confessed to Jackson's murder only after his will was overborne by more than seven hours of "sophisticated physical and mental coercion." A confession is involuntary or coerced if the totality of the circumstances demonstrates that the confessor did not make the decision to confess of his own free will. *Green v. State*, 934 S.W.2d 92, 99 (Tex. Crim. App.1996) (citing *Arizona v. Fulminante*, 499 U.S. 279, 285-86 (1991)); *Scott v. State*, 165 S.W.27, 43 (Tex. App.—Austin 2005, pet. dism'd). We determine whether a confession was voluntary under the due process clause of the Fourteenth Amendment by examining the totality of the circumstances

13

surrounding its acquisition. *Armstrong v. State*, 718 S.W.2d 686, 693 (Tex. Crim. App. 1985); *Scott*, 165 S.W.3d at 43.

Vasquez points to a number of factors in the interrogation that he alleges acted in combination to render his confession involuntary. He first points to the duration of the interrogation. Our review of the record shows that Vasquez was subjected to over seven hours of increasingly coercive interrogation before admitting his guilt shortly after midnight. Statements were also made by the detectives that could have been interpreted to indicate that the interrogation would not cease until Vasquez confessed. For example, Detective De Los Santos told Vasquez that his story was inconsistent with what they had been told by others and then stated, "You know, we are not going to go away. We are going to keep pushing and pushing and pushing and pushing, Ok." Twenty minutes before making his first admission, Detective De Los Santos told Vasquez, "I've got nothing but time on my hands." There were also long pauses in the interrogation in which the detectives were present, but remained silent, or where Vasquez was left alone in the closed interview room. Vasquez also notes that he was isolated from his wife, and that the officers used a variety of techniques to keep him from leaving. As discussed in our summary of the interrogation, the record is replete with instances in which clear requests by Vasquez to leave or see his wife were ignored by the officers.

Vasquez also alleges that the detectives took advantage of his mental illness and made improper promises. A confession is invalid if it was induced by a promise that was "positive, made or sanctioned by someone in authority, and of such an influential nature that it would cause a

14

defendant to speak untruthfully."[6] *Martinez v. State*, 127 S.W.3d 792, 794 (Tex. Crim. App. 2004). A consistent theme used in the interrogation involved the officers vaguely promising to "help" Vasquez but stating that Vasquez had to first "help himself" by telling the truth. Our review of the videotape also reveals two instances which could possibly be interpreted as more specific promises, both occurring within half an hour of Vasquez's first admission. On one occasion Vasquez was told that he could have a cigarette if he "told the truth." Soon after, Detective Scanlon told Vasquez, "we can get you some medication. Tell us what happened . . . . [I]f you tell us the truth of what happened, you know, we're gonna do everything we can to get you the help you need." Detective De Los Santos added, "we can't help you if you don't help yourself." However, the detectives' vague promises of "help," or the promise of cigarettes, were not of such an influential nature that they would have caused Vasquez to speak untruthfully. *See Martinez*, 127 S.W.3d at 794. Although a promise of needed medication would be much more compelling, it is unclear from our examination of the videotape that a promise of assisting Vasquez in obtaining medication was made or that such a promise actually induced the confession. *See id.* The detectives only mentioned that they could assist Vasquez in obtaining medication once in the course of the seven-hour interrogation during which the detectives appealed to Vasquez in countless other ways.

We agree that Vasquez was a vulnerable individual who was subjected to a lengthy, coercive, and sustained interrogation by two trained homicide detectives bent on obtaining a

---

[6] It is important to note that it is irrelevant whether the statement made was actually true or false "because it is the methods used to extract an involuntary confession that offend constitutional principles." *State v. Terrazas*, 4 S.W.3d 720, 723-24 (Tex. Crim. App. 1999); *see also Martinez v. State*, 127 S.W.3d 792, 794-95 (Tex. Crim. App. 2004). We focus only on the nature of the promise. *See Martinez*, 127 S.W.3d at 794-95.

confession. But the detectives' success in persuading Vasquez to confess does not indicate that Vasquez's decision was not made of his own free will.[7] *See Green v. State*, 934 S.W.2d at 99; *Scott*, 165 S.W.3d at 43. Vasquez was repeatedly told that he could leave, the door to the interrogation room was open, and he was even given his car keys. With every opportunity to end the interrogation, Vasquez chose to return to his seat and continue speaking with the detectives. Although the detectives certainly made it inconvenient for Vasquez to end the interrogation by taking his boots and isolating him from his wife, viewing the totality of the circumstances, we do not find that the district court erred in finding that Vasquez's confession was voluntarily made. For the same reasons that the district court properly found Vasquez's statement to be voluntarily made, the district court's finding that Vasquez freely and voluntarily waived his rights is also supported by the record. Accordingly, we overrule Vasquez's second and third points of error.

**Instruction on Voluntariness**

In his fourth point of error, Vasquez contends that the district court erred by failing to submit the issue of voluntariness to the jury. Article 38.22, section 6, of the code of criminal procedure sets forth a two-step procedure for determining voluntariness. It first requires that the trial

---

[7] We stress that there is nothing inherently inappropriate about the coercive nature of the police questioning in this case. Courts have long acknowledged the legitimate role of interrogation in the investigation of crime. "Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished." *Shneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). By permitting coercive interrogation, but barring the use of involuntary confessions, "the Constitution requires the sacrifice of neither security nor liberty." *Id*.

16

court make an independent finding in the absence of the jury on the voluntariness of a confession. Tex. Code Crim. Proc. Ann. art. 38.22, § 6. If the trial court finds that the confession was voluntarily made, the statute states that the issue may then be submitted to the jury, and the jury must be instructed that it shall not consider the confession unless it believes beyond a reasonable doubt that the confession was voluntarily made. *Id.* Vasquez alleges that he was entitled to a statutory instruction on voluntariness because (1) the evidence raised the issue regarding the voluntariness of the confession and (2) trial counsel properly requested an instruction on the issue. The district court denied the requested instruction after the State argued that Vasquez was only entitled to an instruction if there was a factual dispute regarding the events of the interrogation.[8] The State advances the same argument on appeal. We disagree. As we explain below, (1) article 38.22, section 6, is a unique inquiry that does not require disputed facts to "raise an issue" as to voluntariness, and (2) there is some evidence that Vasquez's confession was not voluntarily made.

### Confession law

The code of criminal procedure contains specific provisions governing the admission and consideration of confessions. Article 38.21 contains a blanket prohibition on the admission of involuntary confessions. *See* Tex. Code Crim. Proc. Ann. art. 38.21. Article 38.22 contains a detailed set of procedures governing the use of written and oral statements as evidence. *Id*. art.

---

[8] The district court cited two opinions from the court of criminal appeals to justify its ruling, *Mendoza v. State*, 88 S.W.3d 236 (Tex. Crim. App. 2002) and *Muniz v. State*, 851 S.W.2d 238 (Tex. Crim. App. 1993).

38.22. For example, article 38.22 specifically incorporates the *Miranda* warning requirements and places limitations on the use of oral statements that are not electronically recorded. *See id*. art. 38.22, §§ 2, 3. Article 38.22, section 6, outlines the procedure for determining whether a statement was voluntarily made. A defendant is first entitled to a hearing outside the presence of the jury in which the trial court must make an independent finding on voluntariness. *See id*. art. 38.22, § 6. If the trial court determines that the statement was voluntarily made, section 6 then allows the issue to be submitted to the jury:

> Upon the finding by the judge as a matter of law and fact that the statement was voluntarily made, evidence pertaining to such matter may be submitted to the jury and it shall be instructed that unless the jury believes beyond a reasonable doubt that the statement was voluntarily made, the jury shall not consider such statement for any purpose nor any evidence obtained as a result thereof.

*Id*. Article 38.22, section 7, also provides, "When the issue is raised by the evidence, the trial judge shall appropriately instruct the jury, generally, on the law pertaining to such statement." *Id*. art. 38.22, § 7. A defendant is not entitled to an instruction on the voluntariness of a statement in every case. The evidence admitted at trial must, in fact, raise a question as to its voluntariness. *Id*. art. 38.22, § 6; *Terrazas,* 4 S.W.3d at 724; *Hernandez v. State*, 819 S.W.2d 806, 812 (Tex. Crim. App. 1991). "Raising an issue as to the voluntariness of a confession means that *some evidence* must be presented to the jury that the confession was not given voluntarily." *Hernandez*, 819 S.W.2d at 812 (emphasis added). Commentators Dix and Dawson have formulated the standard as such: "[T]he application of the legal standard for voluntariness to agreed facts should be a jury issue, *if* those facts are ones from which a reasonable jury could conclude that the statement at issue was involuntary."

18

41 George E. Dix & Robert O. Dawson, *Texas Practice: Criminal Practice and Procedure* § 13.393 at 219 (2nd ed. 2001) (hereafter Dix and Dawson).[9]

The court of criminal appeals discussed what type of evidence raises a question of voluntariness in *Terrazas*. *See* 4 S.W.3d at 727. Linking the standard for an instruction with the standard for shifting the burden on the State to prove voluntariness at a pretrial hearing, the court of criminal appeals focused on the nature of the evidence. *See id*. at 726-27. The court pointed to practices it described as "inherently coercive" such as lengthy interrogation, threats of violence, and detention incommunicado without advice of counsel or friends. *See id*. The United States Supreme Court has also identified a variety of factors raising the issue of voluntariness including: the youth of the accused, his lack of education, his low intelligence, the absence of *Miranda* warnings, the repeated and prolonged nature of the questioning, and the use of physical punishment. *See Shneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). These factors are not exclusive, and we look at the totality of the circumstances. *See id*. Moreover, the defendant need not testify or call any witnesses for the issue of voluntariness to be raised by the evidence. *Muniz v. State*, 851 S.W.2d 238, 255 n.12 (Tex. Crim. App. 1993). The issue may be raised through cross-examination or by evidence introduced by the State. *See id*.

---

[9] Defining "some evidence" of involuntariness in terms of whether a reasonable jury could conclude the confession was involuntary is consistent with use of the term in the context of competence to stand trial. In determining whether a defendant is entitled to a competency hearing before a jury, the court of criminal appeals has held that "some evidence" of incompetence is "a quantity more than none or a scintilla, that rationally may lead to a conclusion of incompetence." *Alcott v. State*, 51 S.W.3d 596, 600 (Tex. Crim. App. 2001) (quoting *Sisco v. State*, 599 S.W.2d 607, 613 (Tex. Crim. App. 1980)).

19

*Factual dispute not required*

The district court denied Vasquez an instruction based on the State's incorrect argument, and other case law, suggesting that a defendant is only entitled to an instruction on voluntariness if the determination requires the resolution of disputed facts. This misinterpretation of the law is quite understandable in light of the "considerable confusion [in the case law] between the standard for jury submission of voluntariness under article 38.22 and that for submission of an exclusionary rule issue under article 38.23." Dix and Dawson § 13.393 at 219. Article 38.23(a) prohibits the admission of illegally obtained evidence and provides that the issue be submitted to the jury. *See* Tex. Code Crim. Proc. Ann. art. 38.23(a). The case law has limited this provision to require an instruction "only if there is a factual dispute about how the evidence was obtained." *Garza v. State*, 126 S.W.3d 79, 85 (Tex. Crim. App. 2004); *see Jordan v. State*, 562 S.W.2d 472, 472-73 (Tex. Crim. App. 1978). In determining whether evidence was illegally obtained, the application of the law is left to the court and only the resolution of contested facts is submitted to the jury. *See Garza v. State*, 126 S.W.3d at 85; *Jordan*, 562 S.W.2d at 473; *Lee*, 70 S.W.2d at 187. Although an involuntary confession is also illegally obtained, *see Blackburn*, 361 U.S. at 210, the admission of statements is governed by articles 38.21 and 38.22, not article 38.23.

Several cases from the court of criminal appeals, including one cited by the district court, appear to require disputed facts in discussing whether a defendant is entitled to submit the issue of the voluntariness of his confession to the jury. *See Mendoza v. State*, 88 S.W.3d 236, 239 (Tex. Crim. App. 2002); *Dinkins v. State*, 894 S.W.2d 330, 353 (Tex. Crim. App. 1995); *Thomas v. State*, 723 S.W.2d 696, 707 (Tex. Crim. App. 1986). However, in these cases the instruction

20

requested by Vasquez was actually given by the district court, *see Mendoza*, 88 S.W.3d at 240; *Dinkins*, 894 S.W.2d at 352-53, or the court of criminal appeals discussed the issue in terms of article 38.23 (illegally obtained evidence), rather than article 38.22 (voluntariness). *See Mendoza*, 88 S.W.3d at 239; *Thomas*, 723 S.W.2d at 706-07.

In *Mendoza*, the court of criminal appeals stated that the jury should be instructed when evidence raises a "factual issue as to whether a defendant had been warned of his rights and voluntarily waived them prior to making a statement. . . ." *Id*. at 239 (citing *Dinkins*). In discussing the mandatory nature of an instruction on voluntariness, the court of criminal appeals cited article 38.23(a), not article 38.22. *See* 88 S.W.3d at 239. Notably, the trial court had given an instruction on voluntariness, and the only issue before the court of criminal appeals was whether Mendoza was entitled to *additional instructions* applying the law to the specific facts of the case. *See id*. at 240. In *Dinkins*, the court of criminal appeals held that Dinkins was not entitled to an instruction because there was no "*factual* dispute before the jury over whether [he] invoked his right to counsel prior to making his confession." 894 S.W.2d at 354. As in *Mendoza*, the trial court had given a general instruction on voluntariness and Dinkins's appeal concerned whether he was entitled to a more specific instruction applying the law to the specific facts of the case. *See id*. at 352-53. The court of criminal appeals' focus on "factual disputes" in *Thomas* is also not relevant to the standard for an instruction under article 38.22, section 6. *See* 723 S.W.2d at 707. Thomas argued that his statement was inadmissible because it was made after he had invoked his right to counsel. *See Thomas*, 723 S.W.2d at 706-07. The court found Thomas's claim regarding article 38.22 unpreserved and only discussed the right to an instruction pursuant to 38.23(a). *See id*.

21

Furthermore, the history behind article 38.22 supports the interpretation that it requires submission of the issue of voluntariness even when underlying facts on which the determination is made are undisputed. Article 38.22 was adopted in response to the Supreme Court's ruling in *Jackson v. Denno*, 378 U.S. 368 (1964), and the Texas Court of Criminal Appeals's application of the *Jackson v. Denno* approach to Texas law in *Lopez v. State*, 384 S.W.2d 345 (Tex. Crim. App. 1964). Before *Jackson v. Denno*, there were three general types of procedures among the states for determining the voluntariness of a confession. *See* James Hope Peacock II, *Procedure—Defendant Entitled to Hearing on Voluntariness of Confession Before It Goes to the Jury*, 43 Tex. L. Rev. 396, 396 (1965). The first was the "orthodox rule," under which the judge determined whether the confession was voluntary and thus admissible; the jury considered only whether the confession was credible. *See Jackson* 378 U.S. at 411 app. A-I (Harlan, J., dissenting). The second was the "Massachusetts rule," under which the judge heard all the evidence and ruled on voluntariness before allowing a confession into evidence; if the judge found the confession voluntary, the jury was then instructed that it must also find the confession voluntary before considering it. *Id*. at 417 app. A-III. The third was the "New York rule," which Texas had followed before *Jackson v. Denno*. *Id*. at 414, 417 app. A-III. The United States Supreme Court explained that the "New York rule" required a judge to submit the issue of voluntariness to the jury, "where certain facts bearing on the issue are in dispute *or where reasonable men could differ over the inferences to be drawn from undisputed facts*." *Id*. at 377 (emphasis added).

*Jackson v. Denno* disapproved the New York rule. *Jackson*, 378 U.S. at 369-70. The Supreme Court found that the rule had "a significant impact upon the defendant's Fourteenth Amendment rights" because it makes it

22

impossible to discover whether the jury found the confession voluntary and relied upon it, or involuntary and supposedly ignored it. Nor is there any indication of how the jury resolved disputes in the evidence concerning the critical facts underlying the coercion issue. Indeed, there is nothing to show that these matters were resolved at all, one way or the other.

*Id*. at 379-80. At the same time, the Supreme Court found no similar constitutional problem with the two-step Massachusetts procedure. *Id*. at 380 n.8.

We raise no question here concerning the Massachusetts procedure. In jurisdictions following this rule, the judge hears the confession evidence, himself resolves evidentiary conflicts and gives his own answer to the coercion issue, rejecting confessions he deems involuntary and admitting only those he believes voluntary. It is only the latter confessions that are heard by the jury, which may then, under this procedure, *disagree with the judge, find the confession involuntary and ignore it.* Given the integrity of the preliminary proceedings before the judge, the Massachusetts procedure does not, in our opinion, pose hazards to the rights of a defendant. While no more will be known about the views of the jury than under the New York rule, the jury does not hear all confessions where there is a fair question of voluntariness, but only those which a judge actually and independently determines to be voluntary, based upon all of the evidence. The judge's consideration of voluntariness is carried out separate and aside from issues of reliability of the confession and the guilt or innocence of the accused and without regard to the fact the issue may again be raised before the jury if decided against the defendant. The record will show the judge's conclusions in this regard and his findings upon the underlying facts may be express or ascertainable from the record.

*Id*. (emphasis added).

As noted, before *Jackson v. Denno,* Texas had followed the New York rule, leaving solely to the jury the determination of voluntariness. *See Marrufo v. State*, 357 S. W. 2d 761, 764 (Tex. Crim. App. 1962); *Odis v. State*, 345 S. W. 2d 529, 530-531 (Tex. Crim. App. 1961); *Newman v. State*, 187 S. W. 2d 559, 561-562 (Tex. Crim. App. 1945), *cert. denied*, 326 U.S. 772 (1945); *Gipson v. State*, 181 S. W. 2d 76, 77 (Tex. Crim. App. 1944). Subsequently, the Texas Court of

23

Criminal Appeals applied the *Jackson v. Denno* standard by adding a judicial determination of

voluntariness before a confession may be submitted to the jury. *See Lopez*, 384 S.W.2d at 348. In

particular, the court of criminal appeals ordered:

> In new trials arising hereunder and in future trials in this state where there is a fair question of voluntariness of a confession of the defendant, the trial judge shall grant to the defendant the opportunity to object to the use of said confession; shall grant a fair hearing before the Court on the issue of voluntariness, and from all of the evidence and without regard to the truth or falsity of the confession, shall make a clear cut determination of the voluntariness of the confession, including the resolution of disputed facts upon which the voluntariness issue may depend. Upon request, such hearing shall be held and the court's ruling made in the absence of the jury. Unless the trial judge is satisfied that the confession was voluntarily made he shall exclude it. If the confession has been found to have been voluntarily made and held admissible by the Court, it is recommended that the trial judge enter an order stating his findings, which order should be filed among the papers of the cause but not exhibited to the jury.

*Id*. By retaining Texas's reliance on the jury to determine voluntariness, the court adopted a two-step

procedure resembling the Massachusetts rule approved in *Jackson v. Denno*:

> After a confession has been admitted in evidence to the jury, the defendant may still adduce evidence relating to its voluntariness, which evidence may be considered by the trial judge with other evidence on the issue of its voluntariness. If the trial judge concludes from all of the evidence that the confession should not have been admitted, he will withdraw it. Otherwise the jury may and shall, upon request of the defendant, be instructed to the effect that they cannot consider the confession unless they believe beyond a reasonable doubt that it was voluntarily made.

*Id*. Article 38.22 codifies this approach. In light of the unique nature of the voluntariness

determination, the fact that confessions are governed by a separate code provision, and the consistent

24

case law governing article 38.22,[10] we hold that a defendant may be entitled to an instruction on voluntariness even if the facts surrounding his confession are undisputed. An instruction must be given if a reasonable jury, viewing the totality of the circumstances, could have found that the statement was not voluntarily made. *See Hernandez*, 819 S.W.2d at 812; Dix and Dawson § 13.393 at 219.

### *Vasquez raised the issue of voluntariness*

Having clarified the standard, we now review the record to determine whether Vasquez raised the issue of voluntariness—could a reasonable jury have found that his statement was not voluntarily made. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 6; *Terrazas,* 4 S.W.3d at 724; *Hernandez v. State*, 819 S.W.2d at 812. We begin by noting that Vasquez's defense rested almost entirely on attacking his confession as involuntary. During his short opening argument Vasquez's counsel focused solely on the circumstances of the interrogation. He concluded:

> You will see the video of the lengthy interrogation by the police. You will see Mr. Vasquez. You will see the police interaction with Mr. Vasquez. And I submit to you, members of the jury, after you have seen all of the evidence in this case, you will, one, have a reasonable doubt about whether or not that alleged confession was voluntary, and more important, you will have a reasonable doubt about whether or not Guadalupe Vasquez committed this murder.

In the course of making an evidentiary ruling at trial, the district court commented, "it appears the defensive theory is to attack the voluntariness of the confession." Although Vasquez did not testify,

---

[10] *See*, *e.g.*, *Rocha v. State*, 16 S.W.3d 1, 20 (Tex. Crim. App. 2001); *Terrazas,* 4 S.W.3d at 724; *Muniz*, 851 S.W.2d at 254-55; *Miniel v. State*, 831 S.W.2d 310, 316-17 (Tex. Crim. App. 1992); *Hernandez*, 819 S.W.2d at 812; *Morgan v. State*, 502 S.W.2d 722, 723 (Tex. Crim. App. 1973).

the videotape of the interrogation preceding his confession was admitted into evidence. As we have discussed, the videotape is evidence that Vasquez was subjected to a lengthy interrogation. He was separated from his wife, and his requests to speak with her were generally ignored or denied. Vasquez also asked to leave on a number of occasions. When it appeared that Vasquez was actually determined to leave, his boots were taken as evidence. He was told he could leave but that he could not return to his home because police were executing a search warrant. There was also evidence that Vasquez had been prescribed psychiatric medication and that he had attempted suicide on several occasions. Vasquez was told that the detectives would help him obtain medication to control his anger. When Vasquez initially confessed to the murder, he was crying and holding Detective Scanlon's hand. Vasquez was not informed of his *Miranda* rights until after he had given a detailed confession. This is the sort of evidence that has been found to raise the issue of voluntariness. *See Shneckloth*, 412 U.S. at 226; *Terrazas*, 4 S.W.3d at 726-27. Although the trial court did not err by overruling Vasquez's motion to suppress his confession, we hold that, based on the record, a reasonable jury could have concluded that Vasquez's confession was not voluntarily made. *See Hernandez*, 819 S.W.2d at 812; Dix and Dawson § 13.393 at 219. Accordingly, Vasquez was entitled to an instruction on voluntariness pursuant to article 38.22, section 6, of the code of criminal procedure.

**Harm**

We next determine whether the failure to properly instruct the jury harmed Vasquez. A trial court's failure to give an instruction on voluntariness is subject to harm analysis under *Almanza*. *See Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000) (citing *Payne v. State*,

26

11 S.W.3d 231, 231-32 (Tex. Crim. App. 2000)). Because Vasquez made a timely objection to the error in the charge, "reversal is required if the error is 'calculated to injure the rights of defendant,' which means no more than that there must be some harm to the accused from the error." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). Here, the harm resulting from the failure to instruct the jury on voluntariness is obvious. From opening argument on, Vasquez's case was geared towards raising questions in the jury's mind regarding the voluntariness of his confession. As discussed above, the evidence of the circumstances of Vasquez's confession was such that a reasonable juror could have found the confession involuntary. Without the requested instruction, the jury was given no mechanism to act if it was persuaded by the defense case. Furthermore, the State commented specifically on the lack of an instruction in its closing argument:

> There is no written instruction in here whatsoever, as promised by [defense counsel], that if you don't believe that the confession was voluntary you shall not consider it for any purpose. Do you know why? Because it wasn't raised by the evidence. As a matter of law, this is a voluntary confession. Period.

Although there was significant evidence of guilt apart from the confession, the error in the charge effectively negated Vasquez's entire defense. Accordingly, we hold that there was "some harm" resulting from the error. *See Almanza*, 686 S.W.2d at 171. We sustain Vasquez's fourth point of error.

## CONCLUSION

We hold that the district court did not err by admitting Vasquez's statements into evidence or by dictating its findings of fact and conclusions of law into the record. However, because Vasquez was harmed by the district court's erroneous refusal to instruct the jury in

accordance with article 38.22, section 6, of the code of criminal procedure, we reverse the conviction and remand for a new trial consistent with this opinion.

_____

Bea Ann Smith, Justice

Before Chief Justice Law, Justices B. A. Smith and Pemberton

Reversed and Remanded

Filed:   October 21, 2005

Publish