# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-19-00742-CR

**Selina Faith Parsons, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 119TH DISTRICT COURT OF TOM GREEN COUNTY**
**NO. B-17-0946-SB, THE HONORABLE BEN WOODWARD, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellant Selina Faith Parsons pleaded guilty to the offense of aggravated assault with a deadly weapon. *See* Tex. Penal Code § 22.02(a)(2). Following the hearing on punishment, the district court sentenced Parsons to 18 years' imprisonment. In three related points of error on appeal, Parsons asserts that her trial counsel provided ineffective assistance by failing to object to the admissibility of statements that Parsons had made to the police during the investigation. We will affirm the district court's judgment of conviction.

## BACKGROUND

At the punishment hearing, the district court heard evidence that in the early morning hours of July 26, 2017, Parsons's husband, Justin Miller, was sleeping in his bedroom at his home in San Angelo when he awoke to a man stabbing him with a knife. Miller attempted to defend himself and began wrestling with the assailant, who fled from the bedroom. Miller, who

had been stabbed multiple times in his head, hand, and abdomen, stumbled out of the bedroom and made his way to another room in the house, where a safe contained Miller's firearms. However, when Miller opened the safe, his firearms were missing, and he passed out. When Miller regained consciousness, he went into the living room, where he found Parsons and her friend, Danielle Huckabee, on the couch. The assailant had left the house. Miller asked Parsons to call 911, but she did not. Shortly thereafter, Parsons and Huckabee drove Miller to the hospital, where he was treated for his injuries.[1] Miller recounted that in addition to the missing firearms, he noticed during the assault that his cell phone was missing from the nightstand next to his bed, where he usually kept it while he slept. Miller also testified that he had security cameras installed throughout his house, but in his review of the security-camera footage from the time of the assault, he discovered "a blank spot missing from the security system."

The assailant was later identified as Chris Lange, Parsons's ex-boyfriend.[2] The evidence tended to show that there was a conspiracy between Parsons and Lange to kidnap Miller. Huckabee, who was a co-defendant in the case, testified that in June 2017, she overheard a conversation between Parsons and Lange in which Parsons told Lange that he, his brother, and his friend were to enter Miller's house, "get Justin, like, tie him up, put something over his head, and then they were going to take him to Dallas or Austin" and "drop him off" there.

---

[1] The injuries were serious. Miller testified that he had lacerations on his head and left ear; that a tendon on his left hand was severed, requiring surgery and months of physical therapy; and that the injuries to his abdomen required emergency surgery and the removal and reattachment of part of his bowel.

[2] Lange was tried separately and convicted of the offense of aggravated assault with a deadly weapon. This Court affirmed his conviction on appeal. *See Lange v. State*, No. 03-18-00704-CR, 2019 WL 3023313, at *2 (Tex. App.—Austin July 11, 2019, no pet.) (mem. op., not designated for publication).

Huckabee recounted that on the night of the assault, after Miller had gone to bed, she was on the couch in the living room when she saw Parsons go into Miller's office, where his firearms and the controls to the security cameras were located. Huckabee then saw Parsons go into Miller's bedroom to "sleep with Justin." Afterwards, Parsons returned to the living room, and Lange entered the house, holding two knives, including one that looked like a hatchet. Huckabee testified that she saw Lange and Parsons talking in the kitchen, and she heard Parsons tell Lange that Miller was asleep in the bedroom. Parsons then went to the couch with Huckabee and "held her tight," while Lange went to the bedroom.

Huckabee then "heard screams coming from Justin" and shortly thereafter saw Lange run out of the house. She also saw Miller, who was bleeding heavily, exit the bedroom, "collapse several times" on the floor, and plead with Parsons and Huckabee to call 911 because "he was dying." Huckabee was "freaking out" because she "can't handle the sight of blood," while Parsons had "grabbed the phone" but did nothing with it. Eventually, Miller was able to get out of the house, and Parsons and Huckabee followed him out, helped him into Parsons's car, and drove him to the hospital. Huckabee further testified that at the hospital, Parsons "was crying" and "kept saying, 'I'm sorry, Huck, that's not the way it was supposed to happen.'" When asked if Parsons said anything "about it being all her fault," Huckabee testified, "Yes, ma'am, she did."

Detective Matt Hawthorne of the San Angelo Police Department investigated the assault. Hawthorne testified that he interviewed both Huckabee and Parsons at Parsons's house and obtained a written statement from Parsons. The statement, which was admitted into evidence without objection from defense counsel, contained the following:

3

> Me and my coworker (Danielle Huckabee) fell asleep on my couch at 4:15 a.m. and woken up between 5-6 a.m. to a tall male wearing a mask pointed to the couch and put a finger to his mouth. Next thing I know the male ran out and Justin [came] out telling us to call 911. I told him to get in the car and took him up to Shannon [Medical Center]. He kept saying "I'm dying." When we got to Shannon he was tooken [sic] by the ER staff. My coworker and I came back here to the house. I realized that the gun safe was empty and my cameras were off.

Later that day, Hawthorne interviewed Parsons at the police station. He testified that she was not in custody but that he read Parsons her *Miranda* rights[3] anyway "to be on the safe side" because he did not know if she would become a suspect. Hawthorne recounted that during the interview, he told Parsons that her statement was inconsistent with Huckabee's statement and asked her "if she knew who the suspect was." Parsons told Hawthorne that it was Chris Lange, and she explained that she had told Lange that Miller had abused her, which made Lange "mad and upset" and want "revenge" against Miller. Parsons further acknowledged that she had unplugged the security cameras on the night of the assault, that she had taken Miller's firearms from the safe and hidden them in Huckabee's truck, and that Lange had told her on the night of the assault "to tell the cops that it was a burglary gone bad and that the guy was wearing a ski mask," which Parsons admitted was false. Parsons further told Hawthorne that she knew Lange could be violent but that she "never thought it would go to this extreme of measures." When Hawthorne asked Parsons if she believed "Christopher Lange was ever going to try to kill" Miller, Parsons "replied that she believed so, but [Lange] never actually told her anything."

Parsons testified in her defense. When asked "what was the plan" with Lange, Parsons testified, "Mr. Lange was just supposed to go with us and talk to Mr. Miller and maybe

---

[3] *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

rough him up a little bit and help me get out of that house because of how I was treated." She denied telling Lange to stab Miller. Parsons denied making certain statements to the police, including the statements admitting that she had unplugged the security cameras and hidden the firearms. Parsons also claimed that she could not remember anything that she had told the police because she had "a really bad case of insomnia" at the time and had been "up for four days straight." She added, "I honestly do not remember the interview at all."

The district court found Parsons guilty of the charged offense and sentenced her to 18 years' imprisonment as noted above. This appeal followed.

**STANDARD OF REVIEW**

To establish ineffective assistance of counsel, an appellant must demonstrate by a preponderance of the evidence both deficient performance by counsel and prejudice suffered by the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Miller v. State*, 548 S.W.3d 497, 499 (Tex. Crim. App. 2018). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700; *see Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010).

The appellant must first demonstrate that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 687–88; *Ex parte Scott*, 541 S.W.3d 104, 115 (Tex. Crim. App. 2017). To prove deficient performance, "[t]he defendant must overcome 'the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance' and that the conduct constituted sound trial strategy." *Prine v. State*, 537 S.W.3d 113, 117 (Tex. Crim. App. 2017) (quoting *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999)). "To defeat this presumption,

5

'[a]ny allegation of ineffectiveness must be firmly founded in the record and the record must affirmatively demonstrate the alleged ineffectiveness.'" *Id*. (quoting *McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996)). "Trial counsel should generally be given an opportunity to explain his actions before being found ineffective." *Id*. (citing *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003)). "In the face of an undeveloped record, counsel should be found ineffective only if his conduct was 'so outrageous that no competent attorney would have engaged in it.'" *Id*. (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)). "The record on direct appeal is generally insufficient to show that counsel's performance was deficient." *Id*. (citing *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002)). Thus, in most cases, "the better course is to pursue the claim in habeas proceedings." *Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005).

To prove prejudice, the appellant must show the existence of a reasonable probability—one sufficient to undermine confidence in the outcome—that the result of the proceeding would have been different absent counsel's deficient performance. *Strickland*, 466 U.S. at 694; *Burch v. State*, 541 S.W.3d 816, 820 (Tex. Crim. App. 2017). "In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Strickland*, 466 U.S. at 696. "[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id*. "If the deficient performance might have affected a guilty verdict, 'the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Miller*, 548 S.W.3d at 499 (quoting *Strickland*, 466 U.S. at 695). "If the deficient performance might have affected a punishment verdict, the prejudice issue

6

is whether there is a reasonable probability that, absent the errors, the sentencer would have assessed a more lenient punishment." *Id*. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695.

## ANALYSIS

In three related points of error, Parsons asserts that her trial counsel was ineffective in failing to object to the statements that she made to the police. In her first point of error, Parsons asserts that counsel failed to file a motion to suppress the statements, request a hearing on whether they were made voluntarily, or otherwise object to their admission. In her second point of error, Parsons claims that counsel failed to object to the statements on the ground that, before making her statements, Parsons was not given the required statutory warnings. *See* Tex. Code Crim. Proc. art. 38.22, §§ 2(a), 3(a). In her third point of error, Parsons contends that counsel failed to object to the statements on the ground that they were not voluntary. *See id*. § 6.

**Deficient performance**

In the context of a complaint that trial counsel failed to properly pursue a motion to suppress a defendant's statements to the police or request a hearing on whether such statements were voluntary, the burden is on the defendant to show that the statements should have been suppressed. *See Jackson v. State*, 973 S.W.2d 954, 957 (Tex. Crim. App. 1998); *Lozada-Mendoza v. State*, 951 S.W.2d 39, 43 (Tex. App.—Corpus Christi 1997, no pet.). "Counsel is not required to engage in the filing of futile motions." *Mooney v. State*, 817 S.W.2d 693, 698 (Tex. Crim. App. 1991); *Hollis v. State*, 219 S.W.3d 446, 456 (Tex. App.—Austin 2007, no pet.); *see also Ex parte Chandler*, 182 S.W.3d 350, 356 (Tex. Crim. App. 2005)

7

(explaining that "a reasonably competent counsel need not perform a useless or futile act"). Similarly, when claiming that counsel was ineffective for failing to make an objection, the appellant must demonstrate that if counsel had objected, the trial court would have committed error in refusing to sustain the objection. *See Vaughn v. State*, 931 S.W.2d 564, 566 (Tex. Crim. App. 1996); *Jagaroo v. State*, 180 S.W.3d 793, 800 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). Thus, in this case, to show that counsel was deficient for failing to move to suppress, request a hearing on, or otherwise object to the admissibility of Parsons's statements, "the appellant was required to have produced evidence that defeated the presumption of proper police conduct," *Jackson*, 973 S.W.2d at 957, that demonstrated that Parsons's statements were involuntary, *see Jackson v. Denno*, 378 U.S. 368, 376-77 (1964); *Joseph v. State*, 309 S.W.3d 20, 26 (Tex. Crim. App. 2010), or that showed that the statements were inadmissible for some other reason.

Parsons identifies two reasons why she claims her statements were inadmissible: (1) the police failed to provide the statutory warnings required by Article 38.22 of the Code of Criminal Procedure; and (2) Parsons's statements were involuntary. The record does not support either contention.

Article 38.22 provides that no written or oral statement of an accused made as a result of "custodial interrogation" shall be admissible against the accused in a criminal proceeding unless certain warnings are given, including that she has the right to remain silent, the right to an attorney, and the right to terminate the interview at any time. *See* Tex. Code Crim. Proc. art. 38.22, §§ 2(a), 3(a)(2). However, these warnings are required only if the accused is in custody. *See id*. § 5. A person is in custody only if, under the circumstances, a reasonable person would believe that her freedom of movement was "restrained to the degree

8

associated with a formal arrest." *State v. Saenz*, 411 S.W.3d 488, 496 (Tex. Crim. App. 2013) (citing *Stansbury v. California*, 511 U.S. 318, 322 (1994)). "The determination of custody must be made on an ad hoc basis, after considering all of the (objective) circumstances." *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996). "Stationhouse questioning does not, in and of itself, constitute custody." *Id.* Rather, a person is in custody: "(1) when the suspect is physically deprived of [her] freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that [she] cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe that [her] freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that [she] is free to leave." *Id.* The limited record before us is insufficient to conclude that when Parsons made either her written statement at her house or her oral statements at the police station, she was in any of the above situations and was therefore "restrained to the degree associated with a formal arrest." *See id.* Consequently, we cannot conclude that trial counsel was deficient in failing to file a motion to suppress or otherwise object to the admissibility of Parsons's statements on that ground. *See Davis v. State*, 533 S.W.3d 498, 512 (Tex. App.—Corpus Christi-Edinburg 2017, pet. ref'd).

Moreover, even if Parsons had been in custody, Hawthorne testified that before interviewing her at the station, he read Parsons her *Miranda* warnings, which are similar to the warnings required under Article 38.22. *See State v. Pena*, 581 S.W.3d 467, 475 (Tex. App.—Austin 2019, pet. ref'd). Thus, without more information as to what, specifically, Hawthorne said or did not say to Parsons regarding her rights, we cannot conclude that Hawthorne violated the requirements of Article 38.22.

9

We reach a similar conclusion regarding the voluntariness of Parsons's statements. To find counsel deficient for failing to request a hearing on the voluntariness of Parsons's statements, we must be able to conclude from the record that a hearing would have resulted in the suppression of the statements. *See Mowbray v. State*, 788 S.W.2d 658, 671 (Tex. App.—Corpus Christi-Edinburgh 1990, pet. ref'd). There is some evidence in the record that Parsons had a learning disability, was enrolled in Mental Health and Mental Retardation (MHMR) services, and was taking an unspecified medication to treat an unspecified mental illness. Additionally, Parsons testified that she suffered from insomnia at the time of the interview and had not slept in days. However, such evidence is not sufficient by itself to render her statements involuntary and inadmissible. *See Oursbourn v. State*, 259 S.W.3d 159, 173 (Tex. Crim. App. 2008); *Umana v. State*, 447 S.W.3d 346, 350 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). "Whether the accused is mentally ill is but one characteristic among many to consider when evaluating the voluntariness of a confession." *Umana*, 447 S.W.3d at 351. "A confession is involuntary if the totality of the circumstances demonstrates that the confessor did not make the decision to confess of [her] own free will." *Id*. (citing *Vasquez v. State*, 179 S.W.3d 646, 655 (Tex. App.—Austin 2005), *aff'd*, 225 S.W.3d 541 (Tex. Crim. App. 2007)). The circumstances include both the characteristics of the accused and the circumstances surrounding the police interrogation. *Id*. Here, we neither know the extent or severity of Parsons's mental disability or illness, nor do we know the specific circumstances surrounding the police interrogation. Thus, on the limited record before us, we cannot conclude that counsel was deficient for failing to request a hearing on the voluntariness of Parsons's statements.

10

**Prejudice**

Moreover, even if we could conclude on this record that trial counsel was deficient in failing to object to the admissibility Parsons's statements, we could not conclude that Parsons was prejudiced by that failure. This was a case in which Parsons pleaded guilty to participating with her ex-boyfriend in a violent crime that resulted in serious injuries to her husband, and she admitted in her testimony that part of her "plan" was for Lange to "rough [Miller] up a little bit." Additionally, Danielle Huckabee testified that she overheard a conversation between Parsons and Lange in which they discussed a plan to kidnap Miller and that on the night of the assault, she witnessed Parsons commit multiple acts that tended to implicate Parsons in the crime, including: going to the room where Miller kept his firearms and the controls to the security cameras; going to Miller's bedroom and sleeping with him before returning to the living room; talking to Lange after he entered the house armed with knives and telling him that Miller was asleep in the bedroom; holding Huckabee "tightly" when Lange went to the bedroom, which Huckabee believed was an attempt by Parsons to "mak[e] sure [Huckabee] wasn't going anywhere" during the assault; and grabbing the phone but doing nothing with it when Miller asked her repeatedly to call 911. Also, at the hospital, Parsons apologized to Huckabee, told her "that's not the way it was supposed to happen," and admitted that the assault was her fault. On this record, we cannot conclude that there is a reasonable probability that, absent counsel's failure to object to the admissibility of Parsons's statements to the police, the district court would have assessed a more lenient punishment. *See Strickland*, 466 U.S. at 693; *Ex parte Cash*, 178 S.W.3d 816, 818-19 (Tex. Crim. App. 2005).

We overrule Parsons's points of error.

11

**CONCLUSION**

We affirm the district court's judgment of conviction.[4]

_____

Gisela D. Triana, Justice

Before Chief Justice Rose, Justices Baker and Triana

Affirmed

Filed:   August 28, 2020

Do Not Publish

---

[4] Parsons asserts that, as an alternative to reversal, we should abate the appeal and remand the case to the district court for a hearing to develop the record as to her ineffective-assistance-of-counsel claims. This is, in effect, a request to allow Parsons to file an out-of-time motion for new trial. _See Pettway v. State_, 4 S.W.3d 390, 391 (Tex. App.—Houston [1st Dist.] 1999, no pet.). However, the Court of Criminal Appeals has instructed intermediate appellate courts not to allow defendants to file out-of-time motions for new trial, "absent truly extraordinary circumstances" that do not exist here. _See Oldham v. State_, 977 S.W.2d 354, 360 (Tex. Crim. App. 1998). We note, however, that Parsons is not without a remedy to further develop the record as to her ineffective-assistance claims. She may file an application for writ of habeas corpus, which is the preferred vehicle for raising a complaint regarding counsel's performance. _See Ex parte Torres_, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997).