**Motion for Rehearing Overruled; Opinion of April 24, 2012 Withdrawn; Affirmed and Substitute Opinion filed June 14, 2012.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-10-01082-CR

---

**TIMOTHY MORALES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 240th District Court**
**Fort Bend County, Texas**
**Trial Court Cause No. 09-DCR-051416**

---

## SUBSTITUTE OPINION

We overrule the motion for rehearing; we withdraw our opinion dated April 24, 2012, and issue the following substitute opinion.

A jury convicted appellant Timothy Morales of injury to a child and assessed punishment at 55 years' imprisonment. Appellant argues he is entitled to a new trial because the trial court erred by (1) refusing to give a jury instruction on the general voluntariness of his statement to police; and (2) denying his motion to suppress statements he made to police. We affirm.

BACKGROUND

Natalie Baez was appellant's three-year-old step-daughter. Appellant was married to Baez's mother, Dana Ragsdale. On Sunday, March 8, 2009, Baez showed signs of illness; she soiled her bed, vomited, and ran a fever. On the morning of March 9, 2009, she had trouble walking and looked very sick. Appellant brought her to a pediatrician, but Baez became unresponsive and died after being transported to a hospital. An autopsy revealed that she suffered a forceful blow to the stomach, which caused her intestines to rupture against her spine. The medical examiner testified that Baez's injury could have been repaired if she had received appropriate medical attention.

At about 2:00 p.m. on March 10, 2009, Detective David McKinnon of the Fort Bend County Sheriff's Office and Texas Ranger Kip Westmoreland arrived in separate unmarked vehicles to the home where Baez had lived with appellant and Ragsdale. McKinnon and Westmoreland asked Ragsdale and appellant to come to the sheriff's office to be interviewed. Ragsdale and appellant agreed, and they were driven in separate vehicles by the officers. Another detective interviewed Ragsdale while McKinnon and Westmoreland interviewed appellant. A hidden camera recorded the interrogation,[1] and the video was admitted at trial.

The officers began questioning appellant shortly after 3:00 p.m. Appellant later agreed to take a polygraph, and they left with Ragsdale at about 6:15 p.m. to go to a separate building where Captain Sonny Colunga continued the interrogation. The second interrogation began about an hour after they left the sheriff's office. This interrogation also was recorded with a hidden camera, and the video was admitted at trial.

---

[1] McKinnon testified that the encounter began as an interview but developed into an interrogation. *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (defining "interrogation" for *Miranda* purposes as "express questioning" or "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response").

2

Until about 9:15 p.m., appellant steadfastly denied having knowledge of how Baez received her injuries. But then appellant told Colunga the first of three versions of events regarding Baez's injuries. Appellant said that while he was rolling up the windows on his truck Saturday night, Baez jumped from the truck and her stomach hit his knee. He said he did not tell Ragsdale about the incident. After 15 minutes of additional interrogation, appellant gave a second version of events. Appellant said that he fell on top of Baez and his knee hit her stomach. Appellant said he landed on her hard and that he knew it hurt her; Baez told him "it hurt real bad." He admitted to hiding the injury from Ragsdale and explained further, "I had a feeling — I had an idea that it was still from the knee, but then she got a fever, and then with those symptoms of having the fever and stomach pains, she's had them before associated with a stomach virus and the earache. So I guess I kind of let Dana believe that — that those were the symptoms and that that's what it was. . . . I mean, I — I hid it. I land on somebody, I mean, I'm a heavy guy. And it hurt. She was in pain."

At about 9:50 p.m., after additional interrogation, appellant admitted that he did not fall on Baez. He said, "She's always so close to me . . . . And so I have her head, and I just — I shrug her off. . . . With my knee, I shrug her off." He admitted in additional statements that he struck her in the stomach with his knee.

Colunga later brought McKinnon and Westmoreland back to the room for additional interrogation. The interrogation ended shortly before midnight. It is undisputed that appellant never received *Miranda*[2] or Article 38.22[3] warnings before he made any of his statements that night. After the interrogation concluded, Westmoreland drove appellant to his mother's house. Westmoreland returned about an hour or 45 minutes later and arrested appellant.

---

[2] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[3] *See* Tex. Code Crim. Proc. Ann. art. 38.22, §§ 2(a), 3(a) (Vernon 2005).

3

Appellant was indicted for "knowingly, by omission, caus[ing] serious bodily injury to Natalie Baez, a child younger than 15 years of age, . . . by failing to seek and provide timely and necessary medical attention to the complainant, and the defendant had a legal duty to act, to wit: the defendant was the step-parent of the complainant and had assumed care, custody and control of the complainant." *See* Tex. Penal Code Ann. § 22.04(a)(1) (Vernon 2011). Appellant filed a motion to suppress his statements, and the trial court denied the motion after a hearing. The court issued findings of fact and conclusions of law, in particular finding that appellant made his statements voluntarily and that he was not in custody for purposes of *Miranda* and Article 38.22. The trial court also denied appellant's request for a jury instruction "under 38.22, section 6, in regards to voluntariness." Appellant was convicted, and this appeal followed.

### JURY CHARGE

In his first issue, appellant argues that the trial court erred by failing to charge the jury with a "general voluntariness" instruction under Article 38.22, Section 6, of the Code of Criminal Procedure. The State contends that the error was invited, and thus, appellant should be estopped to raise it on appeal. The State also contends that there was no error in light of appellant's trial testimony that he voluntarily answered questions and wanted to cooperate with police.

We hold that appellant did not invite error. We also hold that the general voluntariness instruction did not become law applicable to the case because no reasonable jury, viewing the totality of the circumstances, could find from the evidence admitted at trial that appellant's statements were involuntarily made.[4]

### I.    Types of Instructions Regarding the Voluntariness of a Confession

Article 38.21 of the Code of Criminal Procedure provides, "A statement of an accused may be used in evidence against him if it appears that the same was freely and

---

[4] Because we find no error, we do not address the parties' arguments regarding harm.

voluntarily made without compulsion or persuasion, under the rules hereafter prescribed." Tex. Code Crim. Proc. Ann. art. 38.21 (Vernon 2005). The requirement that a statement be voluntary has been the law in Texas for many years. *See Oursbourn v. State*, 259 S.W.3d 159, 172 n.40 (Tex. Crim. App. 2008) (citing *Cain v. State*, 18 Tex. 387, 389–90 (1857)).

In *Oursbourn*, the Court of Criminal Appeals discussed types of jury instructions related to the voluntariness of a defendant's statements:

> Under Texas statutory law, there are three types of instructions that relate to the taking of confessions: (1) a "general" Article 38.22, § 6 voluntariness instruction; (2) a "general" Article 38.22, § 7 warnings instruction (involving warnings given under § 2 and § 3); and (3) a "specific" Article 38.23(a) exclusionary-rule instruction. In essence, the Section 6 "general" instruction asks the jury: "Do you believe, beyond a reasonable doubt, that the defendant's statement was voluntarily made? If it was not, do not consider the defendant's confession." The Section 7 instruction sets out the requirements of 38.22, § 2 or § 3 and asks the jury to decide whether all of those requirements were met. The Article 38.23(a) "specific" instruction is fact-based: For example, "Do you believe that Officer Obie held a gun to the defendant's head to extract his statement? If so, do not consider the defendant's confession."

*Id.* at 173–74.

## II. Appellant Did Not Invite Error

The State contends that "during the suppression hearing, voir dire, and trial, Appellant focused on proving that he was in custody." The State quotes many excerpts from the record to support this argument. Indeed, while objecting at trial to McKinnon's testimony about the interrogation, trial counsel said:

> I want to add to that argument, Judge, that, again, my whole issue was not the voluntariness on 38.21 but under 38.22 on the oral statement. . . . 38.22, the Code of Criminal Procedure, it's 3a and the whole issue you've heard me argue this is that the warnings — no oral or sign language statement of accused made as a result of custodial interrogation. And that's the issue. Whether or not Mr. Morales was in custody.

5

Nonetheless, at the charge conference in this case, counsel asked the court to "at least give the instructions under 38.22, section 6, in regards to voluntariness." Counsel then dictated his requested instruction. The dictated instruction, however, was not the Section 6 general voluntariness instruction.[5] Instead, the dictated instruction informed the jury that a confession made while a defendant is "in jail or in custody of an officer or while under interrogation" is admissible only if it is freely and voluntarily made, and the instruction incorrectly described appellant's confession as "voluntary" in this case only if it was shown beyond a reasonable doubt that appellant received warnings under *Miranda* or Article 38.22, Sections 2 and 3. Counsel again asked "that under section 6, 38.22, that be included." The trial court denied the instruction. Counsel then made a separate request "under 38.23" for the exact same instruction, contending that there was a genuine dispute about the material fact of custody; the trial court denied the request to include this instruction.[6]

The Court of Criminal Appeals has held that an appellant invites error in a jury charge, and thus may be "estopped" to claim error on appeal, when the appellant (1) affirmatively declines the instruction that the appellant may be entitled to, and the trial court does not give the instruction, *see Druery v. State*, 225 S.W.3d 491, 505–06 (Tex. Crim. App. 2007) and *Prystash v. State*, 3 S.W.3d 522, 529–30, 532 (Tex. Crim. App. 1999); or (2) requests the instruction, and the court so charges the jury, *see Trejo v. State*, 280 S.W.3d 258, 260 (Tex. Crim. App. 2009).

---

[5] "Section 6 expressly dictates the content of that instruction to be as follows: 'unless the jury believes beyond a reasonable doubt that the statement was voluntarily made, the jury shall not consider such statement for any purpose nor any evidence obtained as a result thereof.'" *Oursbourn*, 259 S.W.3d at 175.

[6] The court reasoned that the issue of whether appellant was in custody was a legal question, and there were no controverted historical facts requiring an instruction under Article 38.23. Thus, the trial court apparently understood an important distinction between the submission of a general Article 38.22, Section 6, instruction and an Article 38.23 instruction. *See, e.g.*, *Vasquez v. State*, 225 S.W.3d 541, 545 (Tex. Crim. App. 2007) (noting that a trial court only submits an instruction under Article 38.23 if there is a factual dispute about how the evidence was obtained, but there is no such prerequisite for an instruction under Article 38.22, Section 6).

6

The State does not cite any case in which the appellant was estopped based on invited error when, as in this case, the appellant requested an *incorrect* charge that the trial court *denied*. An appellant's request for an instruction that incorrectly states the law may instead *preserve* error when the trial court declines to give a correct charge. *See, e.g., Chapman v. State*, 921 S.W.2d 694, 695 (Tex. Crim. App. 1996) (en banc).

We hold that appellant did not invite error, and he is not estopped to complain on appeal about the trial court's failure to include a Section 6 general voluntariness instruction.

## III.    Appellant was Not Entitled to the Article 38.22, Section 6, Instruction

Article 38.22, Section 6, "is a very detailed section that is essentially independent of the other sections contained within Article 38.22."[7] *Oursbourn*, 259 S.W.3d at 174. The Court of Criminal Appeals summarized the statute:

---

[7] The statute provides as follows:

In all cases where a question is raised as to the voluntariness of a statement of an accused, the court must make an independent finding in the absence of the jury as to whether the statement was made under voluntary conditions. If the statement has been found to have been voluntarily made and held admissible as a matter of law and fact by the court in a hearing in the absence of the jury, the court must enter an order stating its conclusion as to whether or not the statement was voluntarily made, along with the specific finding of facts upon which the conclusion was based, which order shall be filed among the papers of the cause. Such order shall not be exhibited to the jury nor the finding thereof made known to the jury in any manner. Upon the finding by the judge as a matter of law and fact that the statement was voluntarily made, evidence pertaining to such matter may be submitted to the jury and it shall be instructed that unless the jury believes beyond a reasonable doubt that the statement was voluntarily made, the jury shall not consider such statement for any purpose nor any evidence obtained as a result thereof. In any case where a motion to suppress the statement has been filed and evidence has been submitted to the court on this issue, the court within its discretion may reconsider such evidence in his finding that the statement was voluntarily made and the same evidence submitted to the court at the hearing on the motion to suppress shall be made a part of the record the same as if it were being presented at the time of trial. However, the state or the defendant shall be entitled to present any new evidence on the issue of the voluntariness of the statement prior to the court's final ruling and order stating its findings.

Tex. Code Crim. Proc. Ann. art. 38.22, § 6.

> This is the sequence of events that seems to be contemplated by Section 6: (1) a party notifies the trial judge that there is an issue about the voluntariness of the confession (or the trial judge raises the issue on his own); (2) the trial judge holds a hearing outside the presence of the jury; (3) the trial judge decides whether the confession was voluntary; (4) if the trial judge decides the confession was voluntary, it will be admitted, and a party may offer evidence before the jury suggesting that the confession was not in fact voluntary; (5) if such evidence is offered before the jury, the trial judge shall give the jury a voluntariness instruction.

*Id.* at 175. To be entitled to the Section 6 instruction, an appellant first must "actually litigate" the issue of voluntariness before the trial court — the first three steps identified in *Oursbourn* — and then must introduce some evidence before the jury that would enable it to "find that the facts, disputed or undisputed, rendered him unable to make a voluntary statement." *Id.* at 175–76.

"An instruction must be given if a reasonable jury, viewing the totality of the circumstances, could have found that the statement was not voluntarily made." *Vasquez v. State*, 225 S.W.3d 541, 545 (Tex. Crim. App. 2007) (quotation omitted); *see also Estrada v. State*, 313 S.W.3d 274, 299–300 (Tex. Crim. App. 2010), *cert. denied*, *Estrada v. Texas*, 131 S. Ct. 905 (2011) ("Assuming that appellant offered evidence before the jury suggesting that the confession was not in fact voluntary, we decide that appellant was not entitled to an Article 38.22, § 6 voluntariness instruction because no reasonable jury could find that the facts, disputed or undisputed, rendered him unable to make a voluntary statement." (quotation and footnote omitted)).[8] A confession may be found involuntary when "the totality of the circumstances demonstrates that the confessor did

---

[8] In his motion for rehearing, appellant argues that "the panel ignores the applicable standard of review," citing to "defensive instruction" cases concerning affirmative defenses and lesser included offenses. *See, e.g.*, *Bufkin v. State*, 207 S.W.3d 779 (Tex. Crim. App. 2006). *Oursbourn* clarified that a Section 6 instruction is not a "defensive issue" instruction, *see* 259 S.W.3d at 179–80, and that the standard of review is whether "a reasonable jury could find that the facts, disputed or undisputed, rendered him unable to make a voluntary statement." *Id.* at 176. This "reasonable jury" standard, which we applied on original submission, incorporates the evidentiary standards found in "defensive issue" cases; we consider all of the evidence in the light most favorable to the defendant. *Cf. Brooks v. State*, 323 S.W.3d 893, 899, 907 (Tex. Crim. App. 2010); *City of Keller v. Wilson*, 168 S.W.3d 802, 810, 827 (Tex. 2005).

not make the decision to confess of his own free will." *Green v. State*, 934 S.W.2d 92, 99 (Tex. Crim. App. 1996). "The ultimate question is whether the suspect's will was overborne." *Creager v. State*, 952 S.W.2d 852, 856 (Tex. Crim. App. 1997) (en banc).

"[T]he potential 'involuntary' fact scenarios encompassed by Articles 38.21 and 38.22 are broader in scope than those covered by the Due Process Clause or *Miranda*." *Oursbourn*, 259 S.W.3d at 173. Unlike the federal standard, Texas judges and juries may make "sweeping inquiries into the state of mind of a criminal defendant who has confessed." *Id.* at 172 (quotation omitted). The issue of involuntariness "can be, but need not be, predicated on police overreaching." *Id.* Thus, Section 6 protects people from police overreaching, threats from private actors, and even themselves. *See id.* at 172–73.

*Oursbourn* and other decisions provide guidance on the appropriate factors to be considered when determining if a confession is voluntary. The Court of Criminal Appeals identified a number of fact scenarios in which the defendant's statement was held involuntary under *Miranda* or the Due Process Clause because of police overreaching:

> (1) the suspect was subjected to a four-hour interrogation while incapacitated and sedated in an intensive-care unit; (2) the suspect, while on medication, was interrogated for over eighteen hours without food, medication, or sleep; (3) the police officers held a gun to the head of the wounded suspect to extract a confession; (4) the police interrogated the suspect intermittently for sixteen days using coercive tactics while he was held incommunicado in a closed cell without windows and was given limited food; (5) the suspect was held for four days with inadequate food and medical attention until he confessed; (6) the suspect was subjected to five days of repeated questioning during which police employed coercive tactics; (7) the suspect was held incommunicado for three days with little food, and the confession was obtained when officers informed him that their chief was preparing to admit a lynch mob into the jail; (8) the suspect was questioned by relays of officers for thirty-six hours without an opportunity for sleep.

9

*Id.* at 170–71 (footnotes omitted). The court also identified fact scenarios that could raise state-law claims of involuntariness:

> (1) the suspect was ill and on medication and that fact may have rendered his confession involuntary; (2) the suspect was mentally retarded and may not have knowingly, intelligently and voluntarily waived his rights; (3) the suspect lacked the mental capacity to understand his rights; (4) the suspect was intoxicated, and he did not know what he was signing and thought it was an accident report; (5) the suspect was confronted by the brother-in-law of his murder victim and beaten; (6) the suspect was returned to the store he broke into for questioning by several persons armed with six-shooters.

*Id.* at 172–73 (footnotes and quotations omitted). The court suggested additionally that "youth, intoxication, mental retardation, and other disabilities . . . are factors that a jury, armed with a proper instruction, is entitled to consider." *Id.* at 173.[9] Ultimately the court held that Oursbourn should have received the general voluntariness instruction because there was evidence that he was bipolar and in a depressed or manic state at time of his confession. *Id.* at 181.

Appellant identifies evidence that he contends would enable a reasonable jury to conclude that his confession was involuntary:

- Appellant felt that he had no choice about getting into Westmoreland's vehicle.

- Appellant was told where to sit in the interview room.

- Appellant did not leave the interview room because, as he testified, "I was not going anywhere. I made it clear that I wanted to go home. I was in custody. I was not going home. . . . I respected [the officers]. I asked to go home. They told me I needed to fill in the blanks. How else do you interpret that? I'm not going anywhere until I finish talking. That's how I interpreted that. I was not going anywhere."[10]

---

[9] For additional relevant considerations, see generally 41 George E. Dix and John M. Schmolesky, *Texas Practice Series: Criminal Practice and Procedure* § 16:110 (3d ed. 2011).

[10] We have reviewed the video recordings of appellant's interrogation. Appellant's testimony about filling in the blanks apparently refers to the following exchange during the first interrogation at about 5:25 p.m.:

- Appellant testified he was "[v]ery emotional. Very confused. I didn't know a lot about what I was thinking. All I know is that I wanted to hold my wife. That was my main priority."

- Appellant testified that the officers dictated when appellant's wife was brought into the room, when she could leave, and when he was going to see Colunga.[11]

- Appellant testified, "Every single thing in [the statement] referring to how I did it is a lie because it never happened;" and Ragsdale testified that appellant called her and "said that he told them a story" and that he "made up a BS story to get out of there;" the BS story was that he hurt Baez.

- The length of the interrogation.[12]

---

| Westmoreland: | So, please, you know — do you need something to drink? I mean, we've got a little room right here next door. We can get you a soda, water. |
| --- | --- |
| Appellant: | I just want to get this over with. I just want to go to my wife, go back to my home, go to my family, my friends, be around people who care about me. |
| Westmoreland: | And to do all that, you need to fill in these gaps. We need to figure out what happened, how did that happen. |

[11] The video of the interrogation reveals that appellant said he wanted to talk to Ragsdale before taking a polygraph, and he asked to speak with her about a dozen times over the course of 40 minutes before the officers eventually brought her into the room. But the video does not show the officers dictating when she could leave or requiring appellant to see Colunga. Instead, appellant and Ragsdale agreed while they were alone in the room together that they wanted to take polygraph examinations. Appellant asked his wife, "Let's just take the damn polygraph test and go home, okay?" When Westmoreland knocked on the door and returned to the room, appellant said, "Okay, let's do this. Let's just get this over with. I want to get her home." Appellant asked several times, "What are we waiting on right now?" Westmoreland said, "We're going to leave in just a second. . . . I'm just waiting on Detective McKinnon. . . . We're going to go over to the office where the polygraph is."

[12] McKinnon and Westmoreland first arrived at appellant's home at about 2:00 p.m. The video recording indicates that the first interrogation began shortly after 3:00 p.m. and ended at about 6:00 p.m. when appellant and Ragsdale were left alone in the interview room for about 15 minutes. Everyone then went to another location where they waited for Colunga to arrive. There was testimony that appellant and Ragsdale were talking privately for some of this time, but also that an officer could observe part of the conversation. The interrogation with Colunga began at about 7:10 p.m. Appellant began telling the first version of his knowledge of Baez's injuries at about 9:15 p.m. and ultimately stated at about 9:50 p.m. that he struck her with his knee. The officers then questioned appellant for another two hours. At trial, appellant testified that all three versions were lies. Thus, we consider the length of the interrogation up to the point that he made the allegedly false statements about his knowledge of Baez's injuries: about five to six hours. Regardless, our holding in this case would be the same if we considered the full eight-hour length of the interrogation.

11

- Appellant was separated from his wife.

- Appellant was confronted with and asked to explain evidence that Baez was sexually abused.

- After the first three hours of questioning, appellant had an "emotionally-charged meeting with his wife."[13]

- Appellant agreed to take a polygraph, stating, "Let's just finish this up, take those tests and go home."

- Appellant asked Westmoreland if he and Ragsdale could go home after taking the polygraph, and Westmoreland said, "Absolutely."

- Colunga promptly told appellant that he failed the polygraph and then (1) repeatedly admonished appellant to admit his mistakes; (2) told appellant that if appellant injured Baez accidentally, "Nobody's going to think of you as bad. . . . It ain't going to hurt you, man. . . . [T]here's no problems;" (3) told appellant that what happened to Baez is "not going to go away [but is] going to get worse. . . . [A] person that's hiding something horrible would be a person that would deny this;" (4) said appellant had no decency or love for his step-daughter unless he "clears this matter;" (5) said appellant was "sitting here" because investigators not only "have medical evidence" but also "have crossed their T's and dotted their I's;" (6) told appellant, "[W]hat's best for your little girl . . . is for [you] to sit here and clear up the matter;" and (7) after appellant told the story about Baez landing on appellant's knee, said that he wanted to "save you from that embarrassment" because in light of the medical evidence, no one would believe his story and, "It ain't going to look good," so appellant "can't stick with that story."

This evidence, which largely addresses the issue of custody, is the entirety of the evidence that appellant suggests would enable a reasonable jury to conclude that his confession was involuntary. Reviewed in the light most favorable to appellant, this evidence would not enable a reasonable jury to conclude that his confession was involuntary. He does not point to any evidence suggesting that he was intoxicated, mentally impaired, of low intelligence, ignorant of the situation, or threatened with

---

[13] Appellant notes that during this encounter, (1) Ragsdale asked appellant, "What the f--- happened;" (2) she repeatedly said that she "can't handle this" or "can't do this;" (3) she said, "It's good cop, bad cop;" (4) she told appellant that she believed him and that she knew he would not hurt Baez; and (5) appellant asked Ragsdale how their unborn child was doing.

12

physical violence of any kind, or that the officers made promises or misrepresentations that were calculated to induce him to make a false statement. *See Oursbourn*, 259 S.W.3d at 169–73; *see also Estrada*, 313 S.W.3d at 299–300.

Appellant concedes on appeal that he "never made any effort to leave," and our review of the video confirms this fact. Appellant testified at trial that he (1) was not on any medications, drugs, or alcohol at the time he made his statements, and he was not mentally ill; (2) was 31 years old, six feet tall, 250 pounds, and of average strength; and (3) is "not dumb" and of "average intellect."

Further, appellant testified that he had completed 560 hours of training from the Texas Commission on Law Enforcement Officer Standards and Education and had passed the state test. At the time he was interrogated, he "knew what the *Miranda* rights were." Finally, he testified that he voluntarily answered the officers' questions because he wanted to cooperate:

Q: And you voluntarily answered whatever questions they had and you told them several times that you would answer whatever questions they had, isn't that right?

A: Yes, ma'am, I wanted to be cooperative. I wanted to answer their questions.

\*　　　　　\*　　　　　\*

Q: Why did you go in there?

A: I wanted to cooperate.

\*　　　　　\*　　　　　\*

Q: And, in fact, you were willing to go to the Sheriff's Office. You wanted to answer their questions and help find out what had happened to Natalie, isn't that the truth?

A: Yes, ma'am, I wanted to cooperate, yes, ma'am.

\*　　　　　\*　　　　　\*

13

Q:     So your testimony is that you did want to stay and try to find out what happened to your daughter?

A:     Yes, I wanted to answer the questions they had for me; yes, ma'am.

                    *                    *                    *

Q:     And the truth is, you chose of your own free will with Dana to go ahead and get it over with and talk to the other investigator, isn't that true?

A:     That's true.  It wasn't until he quote/unquote called me a liar that I wanted to get this over with.

                    *                    *                    *

Q:     You exercised your free choice, that was your decision to stay.  You wanted to answer their questions, didn't you?

A:     Yes, ma'am, I did want to answer their questions.

                    *                    *                    *

Q:     You've already told us that you agreed to stay and you wanted to cooperate and help with the investigation, isn't that correct?

A:     That is correct.  I wanted to help with the investigation.

Viewing the evidence as a whole, we follow the admonition that no error results from refusing to include a jury instruction when the evidence does not raise the voluntariness of a defendant's confession.  *See Oursbourn*, 259 S.W. 3d at 174; *see also Perrucci v. State*, No. 03-10-00765-CR, 2011 WL 3890390, at *10–11 (Tex. App.—Austin Aug. 31, 2011, no pet.) (mem. op., not designated for publication) (Section 6 instruction not required because there was no evidence of involuntariness when the defendant testified that the statement he made was voluntary and that he was not coerced or threatened).

Appellant argues that his case is most similar to *Vasquez v. State*, 179 S.W.3d 646 (Tex. App.—Austin 2005), *aff'd* 225 S.W.3d 541 (Tex. Crim. App. 2007).  The Austin Court of Appeals held that, although Vasquez was not entitled to suppression of his statement, there was some evidence of involuntariness mandating instructions to the jury

14

under Article 38.22, Section 6. *Id.* at 657, 662–63. The court identified the following evidence as raising the issue of voluntariness:

- "Vasquez was subjected to a lengthy interrogation [of seven hours]."

- "He was separated from his wife, and his requests to speak with her were generally ignored or denied."

- "Vasquez also asked to leave on a number of occasions. When it appeared that Vasquez was actually determined to leave, his boots were taken as evidence. He was told he could leave but that he could not return to his home because police were executing a search warrant."

- "There was also evidence that Vasquez had been prescribed psychiatric medication and that he had attempted suicide on several occasions."

- "Vasquez was told that the detectives would help him obtain medication to control his anger."

- "When Vasquez initially confessed to the murder, he was crying and holding Detective Scanlon's hand."

- "Vasquez was not informed of his *Miranda* rights until after he had given a detailed confession."

*Id.* at 662. The court reasoned, "This is the sort of evidence that has been found to raise the issue of voluntariness." *Id.*

We conclude that the circumstances in *Vasquez* are distinguishable from the circumstances here. Appellant was separated from Ragsdale during the interrogation, but after he requested to see her, officers brought her into the room and left them alone for about 15 minutes. Appellant and Ragsdale had time alone together while waiting for Colunga to arrive and begin the polygraph exam. During the second interrogation with Colunga, appellant did not ask to see Ragsdale until after he admitted to striking Baez with his knee.

Whereas Vasquez asked to leave, and the officers prevented him from leaving by taking his boots and telling him he could not go home, appellant "never made any effort to leave." He indicated to the officers on several occasions that he wanted to "get this

15

over with" and to "go home," "be with my wife," or "get my wife home," but he never made any direct requests to leave.

As discussed above, there was no evidence appellant suffered any mental infirmity like Vasquez or that police made any promises calculated to induce untruthful incriminating statements. Colunga made several statements about being there to "help" appellant and to serve as appellant's "voice," but these statements were vague and dissimilar from the direct offer to "help" Vasquez obtain medicine. *See Dykes v. State*, 657 S.W.2d 796, 797 (Tex. Crim. App. 1983) (officer's statement that the sheriff would "help" the suspect was "general" and not a promise but rather an "expression[] of opinion"); *Redd v. State*, 14-08-01089-CR, 2009 WL 4810190, at *5 (Tex. App.—Houston [14th Dist.] Dec. 15, 2009, pet. ref'd) ("General statements by an officer that he is there to help defendant and is the only one who can help defendant do not indicate the 'if-then' relationship required to establish a promise."). Although appellant was emotional at the beginning of the interview with McKinnon and Westmoreland when he recounted the timeline of events, he appeared relaxed and calm during the interrogation with Colunga. He did not have an emotional breakdown like Vasquez. In fact, appellant gave Colunga a "fist bump" immediately before he confessed to striking Baez with his knee. Although the lack of *Miranda* warnings is a factor to consider, we cannot ignore that appellant, unlike Vasquez, was trained as a peace officer and knew his *Miranda* rights. The only relevant consideration from *Vasquez* that is similar to appellant's case, therefore, is the lengthy interrogation. *But see Estrada*, 313 S.W.3d at 292, 299–300 (Section 6 instruction not required despite five-hour interrogation in a "coercive environment").

Reviewing the remainder of the evidence highlighted by appellant, we first note that appellant's statements to Ragsdale and testimony that his statements were lies do not indicate involuntariness — the inquiry is to be made without regard to the truth or falsity of the statements. *See Martinez v. State*, 127 S.W.3d 792, 794–95 (Tex. Crim. App.

16

2004) ("[T]he truth or falsity of a confession is irrelevant to a voluntariness determination not only under federal constitutional law but also under state law."). Nothing from the "emotionally-charged meeting with his wife" indicates involuntariness in this case. *See Estrada*, 313 S.W.3d at 290, 299–300 (Section 6 instruction not required despite evidence that after three hours of questioning, the defendant "had an emotional encounter" with his underage girlfriend, who accused the defendant of lying, impregnating another young girl, and killing her; noting that the defendant was "tearful"). To the contrary, the video of this conversation shows that appellant affirmatively desired to continue the interrogation by taking the polygraph exam; he told his wife, "Let's just take the damn polygraph test and go home, okay?" *See Smith v. State*, 779 S.W.2d 417, 428 (Tex. Crim. App. 1989) ("Evidence militating in favor of the trial court's finding of voluntariness includes appellant's desire to take the polygraph . . . ."). And appellant's subjective belief about being in custody is irrelevant to whether he was in custody for purposes of *Miranda*. *See Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996).

The record also reveals that the medical examiner had informed officers there were indications of possible sexual abuse because of an abnormality or tear of Baez's hymen and bruising around her vagina or anus. This was an appropriate inquiry made by McKinnon and Westmoreland during the first part of the interrogation, and they never made any statements that could be interpreted as pressuring appellant into making a confession about causing Baez's other injuries. Nor did appellant testify that the sexual abuse questioning impacted his decision to confess. The video shows that Colunga briefly mentioned these facts before the polygraph, but he never asked appellant about sexual abuse during the two hours leading up to appellant's confession.[14]

Finally, appellant highlights many of Colunga's statements made during the hour before appellant confessed. A reasonable fact-finder could certainly conclude that Colunga's questioning was aggressive, emotional, highly persuasive, and intelligently

---

[14] Appellant was questioned more extensively about sexual abuse after he confessed to striking Baez with his knee.

17

calculated to elicit appellant's confession. But appellant cites no authority holding that this type of interrogation by Colunga indicates involuntariness. Colunga's "success in persuading [appellant] to confess does not indicate that [appellant's] decision was not made of his own free will." *See Vasquez*, 179 S.W.3d at 657. The Austin Court of Appeals "stress[ed] that there is nothing inherently inappropriate about the coercive nature of the police questioning in this case." *Id.* at 657 n.7; *see also Estrada*, 313 S.W.3d at 290, 299–300 (Section 6 instruction not required when a video of the interrogation showed that the officers accused the defendant of lying about his involvement in the murder, told the defendant he was the central figure in the investigation, repeatedly and caustically argued with the defendant about his involvement in the murder, and made statements such as "You're done dude. You're done. You got the girl pregnant, she was causing problems for you. I don't know what happened when you went over there today, but something happened. Something went wrong," and speaking to another detective, "Just be careful [be]cause he's already killed one woman today.").

After reviewing the totality of the circumstances surrounding appellant's confession, we conclude that no reasonable jury could find from this evidence that appellant's statements were involuntary. Thus, the Article 38.22, Section 6, instruction was not part of the law applicable to the case, and the trial court did not err by refusing to instruct the jury regarding the general voluntariness of appellant's statements.

Appellant's first issue is overruled.[15]

---

[15] In his motion for rehearing, appellant argues that we failed to address his contention on original submission that his statement was involuntary because it was "impelled by no more than mere acquiescence to a claim of lawful authority." Appellant analogizes to the situation in which a consent search is held involuntary because of police misconduct, such as lying about having a search warrant. *See Bumper v. North Carolina*, 391 U.S. 543, 549–50 (1968); *see also Flores v. State*, 172 S.W.3d 742, 751–52 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (consent to search house was involuntary when officers frisked defendant without reasonable suspicion, discovered marijuana on him, handcuffed him and placed him in the back of a patrol vehicle, did not give *Miranda* warnings, and told him that his mother and young son would be removed from the house if he did not consent, yet officers had no legal basis for searching the house). Appellant acknowledges that this "discrete argument" was raised for the

In his second issue, appellant argues that the trial court erred by denying his motion to suppress his statements to police because appellant was in custody and did not receive *Miranda* or Article 38.22 warnings. The State argues that appellant failed to preserve error because his particular theory for the inadmissibility of the statements concerning the version of events about striking Baez with his knee does not comport with his arguments in the trial court. Assuming without deciding that appellant has preserved error,[16] we hold that the trial court correctly denied the motion because the record supports the trial court's conclusion that appellant was not in custody.

We review a trial court's ruling on a motion to suppress under a bifurcated standard. *Vasquez v. State*, 324 S.W.3d 912, 918 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). The trial court is the sole finder of fact and judge of the credibility of witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007). We give almost total deference to the trial court's determination of historical facts, but we review *de novo* the court's application of the law to the facts. *Id.* at 25; *see also Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007). We view the evidence presented on a motion to suppress in the light most favorable to the trial court's ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the parties have relitigated the suppression issue at trial, we will examine the trial evidence as well

---

first time in his reply brief. Generally, issues may not be raised for the first time in a reply brief. *See* Tex. R. App. P. 38.3; *Barrios v. State*, 27 S.W.3d 313, 322 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd). Regardless, on original submission we fully considered the impact of the police officers' conduct in this case, taking all inferences from the evidence in appellant's favor. After further consideration of the consent-to-search cases, our decision remains the same — no reasonable jury could find from this evidence that appellant's statements were involuntary.

[16] On appeal, appellant largely focuses on the fact that the officers would have had probable cause to arrest before appellant told the third and final version of events about striking Baez with his knee. Appellant did not make this particular argument in the trial court, but the State noted at the suppression hearing during both its opening and closing statements that the officers' probable cause to arrest was a factor to consider.

19

as the evidence from the suppression hearing. *Mason v. State*, 116 S.W.3d 248, 256–57 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd).

*Miranda* or Article 38.22 warnings must be given only when a suspect is in custody. *Estrada*, 313 S.W.3d at 293. "'In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *Id.* at 294 (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)) (alteration in original). This determination "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 U.S. at 323. A noncustodial interrogation may develop into a custodial interrogation, and some factors to consider include the length of the interrogation, the level of control police exercised over the defendant, and whether the defendant made statements establishing probable cause to arrest that a reasonable person would have realized were incriminating. *Dowthitt*, 931 S.W.2d at 255, 257.

Appellant points to most of the facts discussed in his first issue, and he notes additional evidence: his "mental and emotional state;" his step-daughter had died less than 24 hours beforehand; police viewed appellant as a "possible focus" of the investigation; and there was a "close proximity" of the officers to appellant with "repeated physical contact."[17] Further, appellant contends that the third and final story about striking Baez in the stomach with his knee should have been suppressed because appellant's second story, coupled with his statements about hiding the incident from Ragsdale and letting her believe Baez was merely suffering from the flu, was a "pivotal

---

[17] Appellant's reference to "close proximity" and "repeated physical contact" apparently refers to portions of the first interrogation with McKinnon and Westmoreland. Indeed, they sat close to appellant and touched his shoulder and knee on a few occasions. The video of the second interrogation does not show Colunga for most of the interrogation, and he does not appear to touch appellant.

admission" establishing probable cause to arrest, and a reasonable person would have realized the incriminating nature of the statements.

Appellant relies on *Xu v. State*, 100 S.W.3d 408 (Tex. App.—San Antonio 2002, pet. ref'd), in which the court reversed Xu's conviction in part because he made a pivotal admission. But appellant's alleged pivotal admission was less incriminating than Xu's under the facts of each case. In *Xu*, the defendant was told that his wife was strangled to death, and then he admitted, "I grabbed her by the throat. I was so mad I don't know how hard I squeezed." *Id.* at 412. Here, Colunga repeatedly distinguished between whether Baez was injured "accidentally" or "intentionally." He repeatedly made statements such as, "If you didn't do it intentionally, there's no problems, okay? If it was an accident, I'm here to help you clear this matter up." Appellant's second story about tripping and falling on top of Baez still could have indicated to him that a mere "accident" occurred, thus lessening the likelihood he would view his statement as incriminating.

Appellant also relies on *Dowthwitt*, but in that case, the interrogation was much longer — about twelve hours between the time the defendant arrived at the station and made his pivotal admission — and the police exerted much more control over that defendant; the officers accompanied the defendant during bathroom breaks and ignored his requests to see his wife. 931 S.W.2d at 256–57. Appellant, however, was left alone with his wife after asking to see her and was free to converse with her privately. During the interrogation with Colunga, appellant did not ask to see his wife until after he admitted to striking Baez in the stomach with his knee.

The record also contains substantial evidence weighing against a finding of custody. Appellant voluntarily accompanied the officers to the sheriff's office. He rode in the front passenger seat and was never handcuffed. He carried his cell phone with him. Westmoreland offered appellant some water during the first interrogation, and Colunga offered a snack and beverages. After Colunga told appellant he failed the polygraph, Colunga said, "You don't have to sit here and listen to me any longer if you don't want

to." And after appellant told the second story about Baez's injuries, Colunga said, "Now, I appreciate you staying here, talking to me, and I've told you time and time again, you can go at anytime you want to go, man." Appellant continued to talk with Colunga and did not ask to leave until after he admitted to striking Baez in the stomach with his knee.

Appellant was never told he was under arrest or that he would be arrested. In fact, Westmoreland suggested to appellant before the polygraph that he would not be arrested based on the results: "We don't go and grab somebody off the street, hook them up to a polygraph and either arrest or don't arrest based on that polygraph." Even after appellant made the alleged "pivotal admission," he said, "Let me ask you this: You still look at — still looking at me being arrested and child endangerment?" Colunga responded, "You're not going to go anywhere, man. You're not going to jail. You're going to go home. . . . Now, I'm not here to arrest you. I will never arrest you, okay? All right? That's not me, man. I just want to know the truth, man, and you've got the truth in your heart. Let's get it out, and let's get it out in the open. I don't want them to think that you're a cold-blooded person, because you're not. Now, tell me what happened, man." This exchange signifies that appellant knew he was not under arrest and was not sure if he would be arrested in the future. The totality of the circumstances would indicate to a reasonable person that appellant still was free to leave.

Even after appellant admitted to striking Baez in the stomach with his knee, he told Colunga, "Just please hurry. I'm ready to go home. . . . I want to go home." After additional questioning by Westmoreland, appellant repeatedly referred to the fact that he was going home and would need to talk to his wife about what happened. He agreed to take another polygraph and said, "Just call me next week; we'll set up a time. I'll make sure I can make it, and I'll be there." Westmoreland drove appellant to his mother's house and then returned about an hour later to make the arrest.

The facts of this case are even less indicative of custody than those found in the *Estrada* case. The defendant in *Estrada* was subjected to a five-hour interrogation in a

22

"coercive environment" after he was driven to the police station by an officer. 313 S.W.3d at 294–95. The officers told the defendant he was the "central figure" in the murder investigation. *Id.* at 290. After accusing the defendant of lying, an officer said "the probable cause statement and the — and the arrest warrant" would state that the defendant was at the victim's house. *Id.* at 291. But the officers also told the defendant on several occasions he was free to leave, and the defendant stated several times that he wanted to leave and go home. *Id.* at 295. At the end of the interrogation, an officer told the defendant that they would drive him home but that a warrant would be issued for his arrest. *Id.* at 292. They took him home and then arrested him three hours later. *Id.* The court held that the defendant was not in custody for purposes of *Miranda* and Article 38.22. *Id.* at 294.

Viewing the totality of the evidence discussed above and considering the *Estrada* decision, we conclude appellant was not in custody; his freedom of movement was not restrained to the extent associated with a formal arrest. The trial court correctly denied the motion to suppress.

Appellant's second issue is overruled.

## CONCLUSION

Having overruled both of appellant's issues, we affirm the trial court's judgment.


/s/     William J. Boyce
          Justice


Panel consists of Justices Seymore and Boyce and Senior Justice Yates.[18]

Publish — Tex. R. App. P. 47.2(b).

---

[18] Senior Justice Leslie Brock Yates sitting by assignment.