In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-25-00055-CR
_____

THE STATE OF TEXAS, Appellant

V.

DAVID WADE BRADY JR., Appellee

On Appeal from the 258th District Court
Polk County, Texas
Trial Cause No. 28,266

MEMORANDUM OPINION

A grand jury indicted Appellee David Wade Brady Jr. for the first-degree felony offense of continuous sexual abuse of a child. *See* Tex. Penal Code Ann. § 21.02(b). Brady filed a Motion to Suppress his video-recorded confession. After two hearings, the trial court granted the Motion and suppressed the "recording of Brady's interview after minute 32:44 of elapsed time on the recording[.]" In this accelerated appeal, the State challenges the trial court's Order granting Brady's Motion to

1

Suppress.[1] In two issues, the State argues that the trial court erred by: (1) suppressing portions of Appellee's statements because he was not in custody; and (2) concluding that Appellee's statement was involuntary. For the reasons discussed below, we reverse and remand.

## BACKGROUND AND SUPPRESSION HEARINGS

### Procedural Posture

The April 2021 grand jury indictment alleges that Brady committed acts of sexual abuse against "Violet," who the record establishes is his stepdaughter. In January 2024, Brady moved to suppress his recorded statement made to law enforcement. As relevant to this appeal, in the Motion to Suppress Brady complains that his statement was involuntary.[2] Brady asserts, "The interrogation of Brady was not officially 'custodial,' but it involved a blend or overreaching, delayed warnings, and absence of waiver." In support of this, Brady claims "several factors worked together[,]" including, among other things, that he did not sign the waiver portion of the Miranda warnings, and he "indicated that he wanted to pause the interrogation."

---

[1]The State may appeal an order granting a defendant's motion to suppress if jeopardy has not attached, and the prosecuting attorney certifies that (1) the appeal is not for delay and (2) the suppressed material is of substantial importance to the case. *See* Tex. Code Crim. Proc. Ann. art. 44.01(a)(5); *State v. Wachtendorf*, 475 S.W.3d 895, 899 (Tex. Crim. App. 2015). The district attorney did so in this case.

[2]In the Motion to Suppress, Brady also complains of "inaudibility" in the original recording; however, the State provided enhanced audio addressing that issue at the suppression hearing, and the trial court did not grant the Motion to Suppress on that basis.

2

In February 2025, the trial court conducted two hearings on Brady's Motion to Suppress, with evidence taken only at the first hearing. The trial court conducted the initial suppression hearing on February 3, 2025. Detective David Mitchell was the sole witness who testified at the first suppression hearing. Additional evidence admitted at the first suppression hearing included: a transcript of Brady's recorded interview; a "Statement of Miranda Warnings" signed by Brady indicating he understood his rights with the waiver portion unsigned; and a copy of Brady's February 17, 2020, recorded interview with Detective Mitchell.

Between the first and second suppression hearing, on February 7, 2025, Brady filed a "Memorandum of Law in Support of Defendant's Motion to Suppress Statement to Law Enforcement." Among other things, Brady contends that his desire to terminate the interview but Mitchell's failure to stop immediately was problematic. In conjunction with this, Brady notes the "setting was sufficiently similar to that involved in custody." Thus, he argues that the questions should have stopped when he first invoked his right to stop questioning, and anything he said after that should be excluded. He complains that pressure existed here that made him feel like he was in custody, thus his statement was involuntary. Brady asserts that certain factors indicated voluntariness issues existed, including, among other things: a complete absence of waivers; a setting controlled by law enforcement; the suggestion that an indictment for a very serious crime was inevitable; the suggestion that confessing

3

might help Brady, presented against the backdrop of a wide range of punishment; shaming Brady by indicating that he could save a child from testifying; and a refusal to stop the interrogation when he expressed a desire to do so.

**Detective David Mitchell's Testimony**

Brady called Detective Mitchell to testify at the suppression hearing. He explained that he worked for the Polk County Sheriff's Office as an investigator, and he interviewed Brady in an interview room at the Polk County Sheriff's Office.

Mitchell relayed that he was assigned the case in January 2020, as an aggravated assault of a child, which was what he was investigating. He explained that he first spoke with the victim's mother about the accusations and attended the child's forensic interview. Based on those things, instead of immediately issuing an arrest warrant, Mitchell wanted to hear from Brady. Mitchell testified that on February 13, 2020, he called Brady and asked him to come in for an interview, which Brady did on February 17, 2020. When Mitchell called Brady, he asked Brady if he wanted to come and talk to Mitchell about the case in which Brady was named as the offender.

Mitchell explained he wanted to investigate the case, the circumstances, and the information he had. He wanted Brady to provide his side of the story regarding the allegations against him. According to Mitchell, based on what various people

4

told him, he believed they were dealing with sexual assault of a child, which he agreed "was a very serious charge."

According to Mitchell, Brady came in voluntarily, and Mitchell did not harass, threaten, force, or place him under duress. Brady did not bring a lawyer with him. Mitchell said that Brady had four days to decide whether he wanted an attorney, and Mitchell was not obligated as a police officer to tell Brady he needed one. Mitchell testified that he used his normal, calm tone with Brady, which he described as "conversational" and never raised his voice at Brady. Mitchell denied threatening him and said Brady did not appear to be under duress but was upset, because he had a hard time discussing the case.

Mitchell testified that Brady came into the station, went to the window, and let them know he was there, so Mitchell could come greet him. Mitchell then walked Brady to an interview room. Mitchell agreed Brady could have left before he got to the interview room. Mitchell said he did not lock Brady in the interview room, and he told Brady he was free to leave. Mitchell explained he reiterated to Brady that he did not promise him anything, and at any time Brady could walk out of the interview room. Mitchell believed Brady understood he could leave.

Mitchell claimed the interview was noncustodial and asserted that because of this, he did not have to read Brady his Miranda warnings. Mitchell said he read the Miranda warnings anyway, because of the severity of the case, and he wanted to let

Brady know what his rights were and that he could ask for an attorney at any time. Mitchell testified that several minutes into the interview, he read Brady his rights and gave Brady the paper with the rights listed. According to Mitchell, Brady signed the document confirming he understood his rights, but he did not sign the portion of the form containing the waiver of those rights. Mitchell testified that Brady kept talking to him, indicating Brady waived those rights. He explained that the form contains the rights that he gave Brady and what he read comports with article 38.22. Mitchell testified that he gave the Miranda warnings after Brady said something about committing seven offenses. At that point in Mitchell's testimony, the State stipulated that Brady said it all started within the last year and happened seven times at 8:37 minutes into the interview, and the Miranda warnings happened at 13:57 minutes.

Mitchell denied that someone saying they wanted to terminate an interview was a separate right from conferring with counsel and that "when they say that they want their attorney, they don't want to talk no more, then I finish and stop my interview at that point." Mitchell also denied that he was supposed to stop the interview if someone says they just do not want to talk anymore. Mitchell agreed he told Brady that Brady could help himself by giving a statement.

Mitchell testified that he was investigating a possible aggravated sexual assault of a child, but after the interview, the charge changed to continuous sexual

abuse of a child. Mitchell explained until the time Brady said he wanted to stop, there was not enough to make a continuous sexual abuse charge, but Brady

> continued talking after what you're saying [] that he wanted to stop. He chose to keep talking. As I asked him questions, he answered the questions. He never said that he wanted his attorney, nor did he ever leave out of the interview room like he was instructed he could at any time on his own free will.

Mitchell denied that Brady was under arrest or that there was any coerciveness from him. Although Mitchell agreed that Brady indicated he did not want to talk anymore, he insisted that Brady never asked for an attorney nor exited the interview, which he was free to do. Mitchell testified that he did not arrest Brady that day, instead he let Brady go and did not obtain the arrest warrant until March 10.

**<u>Other Evidence</u>**

A copy of the recorded interview and a transcript from the recorded interview were admitted into evidence. The recorded interview shows that from the beginning until about 7:31 minutes, Mitchell obtained background information from Brady, including that Violet was seven years old. Between 7:33 minutes to 8:03 minutes, Mitchell tells Brady he is not under arrest, does not have an arrest warrant, and Brady is free to leave. Brady then expresses that he misses his family, and at 8:37 minutes into the recording says that "all I really want to tell you . . .is that it all started within the last year . . . 7 times and I never physically hurt her but it did happen." He does not say what "it" is at this point in the interview.

7

After this, for the next several minutes of the interview, Mitchell encourages Brady to "give your side of the story" and "get it off your chest." He also restates his understanding of what Brady told him and the allegations Violet's mother brought forward. Between 12:48 and 13:25 minutes into the interview, Mitchell reads Brady his Miranda rights, asks him if he understands, and instructs him to sign that he understands and that Mitchell read them. Brady begins to ask Mitchell, "So everything I told you so far . . ." Mitchell then tells Brady that " . . . with the Miranda warning, it's something I don't have to do because you are not under arrest, you come in here, for a noncustodial interview, just us sitting down and talking, uh so, that's just something I like to do just to read people their rights just to so, say they know what their rights are." Mitchell then repeats that "I want to be able to get your side," and "[w]ith you just signing that just saying that I read you your rights and you know what your rights are, what your Miranda warning is." Brady signs the document at 15:34 minutes into the interview, indicating he understood his rights but did not sign the portion indicating he waived his rights.

Mitchell proceeds to tell Brady that he can choose what questions he answers. Mitchell then says that people tend to be "more lenient" "the more that you're honest and you're truthful about stuff that went wrong," and "sometimes honesty is the best thing to get you out of stuff[.]" Brady responds, "[T]hat's really all I need to say, is that it did happen, 7 times, and I never physically hurt her."

After denying specific sexual acts, including sexually assaulting Violet with his penis, the transcript and recording show the following exchange occurs:

[28:05 MITCHELL:] Okay, so what went on between y'all? What did you do to her? Did you touch her butt? Did you touch her vagina?

[28:34 BRADY:] It was touching.

[28:39 MITCHELL:] What did you touch? I know it's hard for you to say, I understand that, so just take your time. [29:35] Let's start with this, the 7 times that we're talking, that you've admitted did happen, did it all happen at the house?

[29:42 BRADY:] Yes.

[MITCHELL:] Was [Mother] there or was [Mother] at work?

[29:48 BRADY:] She wasn't there.

[BRADY:] So she wasn't there. So when it was just you, was it just you and Violet there? Or was it just you and Violet and the other two kids there?

[29:57 BRADY:] **[**Inaudible]

[MITCHELL:] Sometimes they were all there or sometimes it was just you and her, or?

[30:14 BRADY:] [inaudible] be playing outside or they weren't there, they didn't see anything.

[MITCHELL:] They didn't observe anything? So kinda tell me how it happened, how it started, I mean, the first time, do you remember the first time that it happened?

[31:04 BRADY:] It's really hard to talk about.

[MITCHELL:] David, I know it's hard to talk about. Like I said, I'm not sitting in here judging you or nothing like that, I'm just wanting to

9

get your side of the story. But something you gotta understand [] David, is we're talking about, you know, something that happened, it happened, we've got to get to the point where, we gotta move forward. You see what I'm saying? As much as it's hard to talk about, I'm just sitting here talking to you, something that happened, we just got to, we gotta just get it out in the open, you know, get it off of the, get the burden of[f] your chest, and you know it's just a hurdle, you know, a bridge we got to cross.

[32:05 BRADY:] The day this all came to surface, I want to say it was January 30th, and it did come off my chest. I miss them a lot.

[32:28 MITCHELL:] Is that when, January 30th, is that when you told [Mother] about it? When she asked you about it?

[32:33 BRADY:] That's whenever she talked to y'all.

[32:40 MITCHELL:] Right. And what did you tell [Mother]?

[32:44 BRADY:] That I'm sorry, there's not a word to describe the remorse and regret that I have. The disgust. You know that was my family, that was my family. [33:25] I'm really sorry but I don't think I can talk anymore. Like if you can give me a couple days.

The interview continues for approximately fourteen more minutes with Mitchell asking Brady for more details about how the incidents occurred. Brady does not leave and makes more incriminating statements yet again, then indicates he does not want to talk anymore.

During one subsequent exchange beginning at 39:33 minutes, the following transpires:

[BRADY:] Over the last year.

[MITCHELL:] So over the last year this happened from time to time, 7 times? Did you ever make her put your penis in her mouth?

10

[BRADY:] Yeah.

[MITCHELL:] In the bathroom?

[BRADY:] That's correct.

[MITCHELL:] So you're in the bathroom and what, you just told her open her mouth or you forcefully put it in her mouth or?

[BRADY:] I don't want to talk anymore.

[MITCHELL:] You don't want to talk? Okay.

[BRADY:] I'm sorry.

[MITCHELL:] I've got enough anyhow[.]

The interview continues after this for over six minutes, with Brady saying it was "hard to talk about" and "hard to relive[.]" It concludes when he asks Mitchell to give him "a couple of days" until he felt "a little bit better to talk about it." At that point, Brady left the station.

## TRIAL COURT'S RULINGS AND
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On February 24, 2025, the trial court signed an Order granting Brady's Motion to Suppress his recorded statement after 32:44 minutes.[3] In an email to the parties, the trial court explains that Brady invoked his right to remain silent when he stated,

---

[3]The record reflects that the trial court initially ruled that he would only suppress the statement beginning at 40:06 but changed the ruling to include a suppression of the statement starting at 32:44 and going forward.

11

"I'm really sorry but I don't think I can talk anymore. Like if you can give me a couple of days."

The trial court entered written "Findings of Fact and Conclusions of Law Regarding Voluntariness of Confession." The trial court states therein that its findings of fact are based on Deputy Mitchell's suppression hearing testimony. As relevant here, the trial court issued the following findings of fact:

> 1. Brady is charged by indictment with a very serious felony offense, namely Continuous Sexual Abuse of a Child Under the Age of 14.
> 2. The alleged victim is Brady's stepdaughter.
> 3. Brady originally was contacted by Deputy Mitchell and was urged to come to the Sheriff's Office in Livingston, Texas. Deputy Mitchell indicated on the telephone call that he wanted to hear Brady's account of what happened.
> 4. Deputy Mitchell did not tell Brady that Brady should bring an attorney with him.
> 5. Brady appeared for the interview on February 18, 2020. A recording was made of the interview, but the sound quality is poor. The only microphone used to capture the sound was not placed close to where Brady was located in the room, and Brady was soft-spoken.
> 6. Deputy Mitchell told Brady that Brady could stop the interview at any time and walk out the door.
> 7. Deputy Mitchell did not provide warnings required by Tex. Code Crim. Proc. Art. 38.22 and by *Miranda v. Arizona,* 384 U.S. 436 (1966) before the interview commenced. The statutory rights and the *Miranda* rights are virtually identical. Deputy Mitchell did not administer the warnings at the beginning of the interview.
> 8. At approximately 15:26 minutes into the interview, Brady signed his name to indicate that he understood the *Miranda* warnings.
> 9. At that time Brady did not sign his name or otherwise indicate that he waived the rights covered by the *Miranda* warnings. In fact, Brady never did so.
> 10. At approximately 31:08 minutes into the interview, Brady stated that he did not think he could talk about what happened. At approximately 33:27 Brady asked if he could have "a couple of days" before talking to Mitchell. At 40:08 into the interview, Brady definitively stated that he wanted to terminate the interview.

12

11. When Brady asked for a couple of days, Brady did not specify that he wanted to spend the time seeking legal advice. The Court takes judicial notice that Livingston, where the interview occurred, has several attorneys who have experience in criminal law and who maintain offices in close proximity to the courthouse and to the building where the interview was conducted.

12. Brady made several statements which were self-incriminating after he had requested the right to terminate the interview.

13. Deputy Mitchell conducted the interview alone, without another officer present to use the "Good cop, bad cop" interview technique (called the "Mutt and Jeff" technique in *Miranda*), to persuade Brady to confess. Mitchell suggested that Brady would be doing a good thing for his stepdaughter by confessing, and that could be viewed favorably by prosecutors or by a judge or jury in a trial. Deputy Mitchell juxtaposed that with an indication that he, Deputy Mitchell, already knew what type of criminal conduct happened between Brady and his stepdaughter.

14. Although the quality of the recording is poor, it does not appear that Deputy Mitchell told Brady about the severity of the punishment for the offense which was likely to be alleged in an indictment.

15. Deputy Mitchell never told Brady that it would be beneficial to Brady to talk to a lawyer.

The trial court also issued the following conclusions of law:

1. Brady did not receive any advice from a lawyer about whether or not to confess or what specifically to say.

2. Brady was told at the outset of the interview that Brady was free to leave. Many minutes later, written *Miranda* warnings were given to Brady and read verbally to Brady by Mitchell. Brady signed the waiver form indicating that he understood the warnings.

3. Brady never signed the portion of the written form indicating that he waived his rights under Art. 38.22 and *Miranda v. Arizona.*

4. In order for a statement to be voluntary, it is not enough for a suspect to merely indicate that he understood his rights. The suspect also must affirmatively waive his *Miranda* rights. Mere acquiescence by participating in an interview does not constitute an adequate waiver.

5. *Miranda* specifically state[s]: "If the individual indicates in any manner, at any time prior to or during questioning, that he wished to remain silent, the interrogation must cease."

6. When an interview continues in violation of the foregoing portion of *Miranda,* any self-incriminating statement made after that point is not voluntary.

13

7. The recording of Brady's interview which continued after he invoked his right to terminate the interview shall be excluded from the State's case in chief.

8. It is arguable that the involuntary portion may still be admissible to impeach Brady, under *Harris v. New York,* 401 U.S. 222 (1971). But *Harris* itself may not be applicable. In *Harris,* there was no issue of the voluntariness of his statement which was offered for impeachment. Later *Mincey v. Arizona,* 437 U.S. 385 (1978) distinguished *Harris* and held that Mincey's self-incriminating statement was not voluntary. Mincey also was suffering from an injury for which he was receiving hospital treatment, but the injury was not the only reason for finding a statement to be involuntary in *Mincey.* Mincey repeatedly asked to stop the interview, but a nurse stepped in and, playing the "good cop" role, suggested that it would be better if Mincey answered. This case seems more like *Mincey* than like *Harris.*

9. Before the State is permitted to play the recording for impeachment purposes, the State first must give Brady the chance to admit or deny that he made a prior statement that is inconsistent with his testimony before a jury.

## SUPPRESSION STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress under a bifurcated standard. *Brodnex v. State*, 485 S.W.3d 432, 436 (Tex. Crim. App. 2016); *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). We give almost total deference to the trial court's determination of historical facts, especially when the trial court's fact findings turn on the witnesses' credibility and demeanor. *See Brodnex*, 485 S.W.3d at 436 (quoting *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010)). We afford the same deference to the trial court's rulings on applying the law to questions of fact and to mixed questions of law and fact, if resolution of those questions depends on an evaluation of the credibility and demeanor of

14

witnesses. *See Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013). We review de novo mixed questions of law and fact that do not depend on credibility and demeanor. *Id.*

At a suppression hearing, the trial court is the exclusive trier of fact and judge of the witnesses' credibility and weight to give their testimony. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007); *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). At the hearing, a trial court may choose to believe or to disbelieve some, all, or part of a witness's testimony. *See Baird v. State*, 398 S.W.3d 220, 226 (Tex. Crim. App. 2013) (citing *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000)).

We view the evidence in a light most favorable to the trial court's rulings and uphold the trial court's ruling on a motion to suppress if that ruling is supported by the record and is correct under any theory of law applicable to the case, even if the trial court gave the wrong reason for its ruling. *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 974 (2004); *see Arguellez*, 409 S.W.3d at 662–63. When the trial court grants a motion to suppress accompanied by findings of fact and conclusions of law, and the State does not contest the trial court's findings of fact, the only question before us is whether the trial court properly applied the law to the facts it found. *See State v. Gray*, 158 S.W.3d 465, 467, 469 (Tex. Crim. App. 2005); *Guzman v. State*, 955 S.W.2d 85, 86–87, 89 (Tex. Crim. App. 1997).

15

## ISSUE ONE: CUSTODY AND
## INVOCATION OF RIGHT TO REMAIN SILENT

In issue one, the State argues that the trial court erred because Brady was not in custody during his interview. Thus, it asserts that the *Miranda* and article 38.22 warnings were not required. The trial court suppressed Brady's recorded interview after minute 32:44, having determined that Brady's *Miranda* rights were violated since he invoked his right to remain silent by stating that he wished to terminate the interview. Since *Miranda* and 38.22 apply only to custodial interrogations, implicit in the trial court's determination that Brady's *Miranda* rights were violated is the trial court's conclusion that Brady was in custody for some portion of the interview. The State contends no evidence supports that a reasonable person, in Brady's position, would have believed that his freedom of movement was restricted to the degree associated with a formal arrest.[4] We find it is necessary to our resolution of

---

[4]Brady responds that the State has not shown harm by the trial court's suppression ruling. The statute allowing for an interlocutory appeal of a trial court's granting of defendant's motion to suppress only requires the prosecuting attorney to certify the evidence suppressed has "substantial importance" to the State's case. *See* Tex. Code Crim. Proc. Ann. art. 44.01(a)(5). Erroneously suppressing evidence of "substantial importance" to the State's case is harmful. "Courts do not go behind the certification to examine the importance of the suppressed evidence precisely because they rely upon the elected prosecutor's certification[.]" *State v. Redus*, 445 S.W.3d 151, 158 (Tex. Crim. App. 2014) (citations omitted) (stating same in context of jurisdictional analysis).

issue one to address two questions: (1) when custody attached, if at all; and if so, (2) whether Brady invoked his right to remain silent.

**Custody**

Whether a defendant was in custody for purposes of *Miranda* is a mixed question of law and fact, so "we apply (1) a deferential standard of review to the trial court's factual assessment of the circumstances surrounding the interrogation, and (2) a *de novo* review to its ultimate legal determination that appellee was in custody." *State v. Saenz*, 411 S.W.3d 488, 494 (Tex. Crim. App. 2013) (citations omitted); *see also Thompson v. Keohane*, 516 U.S. 99, 112–13 (1995) (explaining that appellate court conducts a factual review surrounding interrogation circumstances and legal determination about whether a person would not have felt at liberty to leave).

Generally, *Miranda* warnings are required if the police have taken a defendant into custody. *See Miranda v. Arizona*, 384 U.S. 436, 444, 478–79 (1966); *Herrera v. State*, 241 S.W.3d 520, 525–26 (Tex. Crim. App. 2007). That said, *Miranda* and article 38.22 warnings are required only when there is a *custodial interrogation*. *See Herrera*, 241 S.W.3d at 526. A defendant bears the initial burden to show his statement was the product of a custodial interrogation. *Id.* The State has no burden to show compliance with *Miranda* unless the record as a whole "clearly establishes" that the defendant's statement was the product of a custodial interrogation. *Id.*; *Wilkerson v. State*, 173 S.W.3d 521, 532 (Tex. Crim. App. 2005). Custodial

17

interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. "A person is in 'custody' only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest." *See Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996) (citing *Stansbury v. California*, 511 U.S. 318, 323–25 (1994)); *see also Herrera*, 241 S.W.3d at 525.

The Court of Criminal Appeals has outlined at least four general situations which may constitute "custody:" (1) when the suspect is physically deprived of his freedom of action in any significant way; (2) when a law enforcement officer tells the suspect that he cannot leave; (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave. *Wexler v. State*, 625 S.W.3d 162, 167–68 (Tex. Crim. App. 2021); *Dowthitt*, 931 S.W.2d at 255. In the first three situations, the restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention. *Wexler*, 625 S.W.3d at 168; *Dowthitt*, 931 S.W.2d at 255. In the fourth custodial situation, *Dowthitt* explains,

> *Stansbury* dictates that the officers' knowledge of probable cause be manifested to the suspect. Such manifestation could occur if

18

information substantiating probable cause is related by the officers to the suspect or by the suspect to the officers. Moreover, given our emphasis on probable cause as a "factor" in other cases, situation four does not automatically establish custody; rather, custody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest.

*Dowthitt*, 931 S.W.2d at 255 (citations omitted). "Stationhouse questioning does not, in and of itself, constitute custody." *Id*. "However, the mere fact that an interrogation begins as noncustodial does not prevent custody from arising later; police conduct during the encounter may cause a consensual inquiry to escalate into custodial interrogation." *Id.* (citation omitted). Factors to consider in determining whether a noncustodial interrogation escalated into a custodial interrogation include: "(1) the length of the interrogation; (2) the level of control police exercised over the defendant; and (3) whether the defendant made statements providing probable cause for arrest that a reasonable person would have known to be incriminating." *Morales v. State*, 371 S.W.3d 576, 590 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (citing *Dowthitt*, 931 S.W.2d at 255, 257).

In this case, Brady came to the police station voluntarily, Mitchell told him that he was not under arrest, and Brady was told more than once he could leave at any time. It is undisputed that this encounter began as a noncustodial interrogation, and Brady was allowed to leave. We conclude based on this record that the first three *Dowthitt* custody situations clearly would not apply because the record does not

19

show the officers restricted Brady's freedom of movement to the degree associated with an arrest. As to the fourth situation and whether this interrogation transformed into a custodial interrogation we examine whether there was probable cause to arrest, and law enforcement officers did not tell the suspect that he is free to leave. *See id.*; *see also Wexler*, 625 S.W.3d at 167–68.

As outlined above, between 28:39 minutes and 32:44 minutes on the video of the interview, Brady admits to "touching" Violet's vagina seven times and said that he told his wife, "I'm sorry, there's not a word to describe the remorse and regret that I have. The disgust." At this point, there is a manifestation of probable cause as Brady conveys "information substantiating probable cause" to Mitchell. *See Dowthitt*, 931 S.W.2d at 255 (explaining that manifestation of probable cause can occur if officers relate information substantiating probable cause to the suspect or the suspect relays such information to the officers). We look at this manifestation "combined with other circumstances" to determine if they would lead a reasonable person to believe he is under restraint to the degree associated with an arrest. *See id.*; *see also Stansbury*, 511 U.S. at 325. These other circumstances include things like the interview's duration, exercise of police control, location of questioning, whether the suspect arrived voluntarily, whether he was denied access to family, whether the person was in restraints and whether he was allowed to leave after the interview. *See Saenz*, 411 S.W.3d at 496 (noting duration and exercise of police control); *Gardner*

20

*v. State*, 306 S.W.3d 274, 294–95 (Tex Crim. App. 2009) (noting lack of arrest warrant of which appellant was told and that he left the police station after being questioned, among other things); *Dowthitt*, 931 S.W.2d at 255–57 (noting duration and exercise of police control); *see also Howes v. Fields*, 565 U.S. 499, 509 (2012) (noting location, duration, statements made during interview, physical restraints, and release of interviewee after questioning).

The evidence here supports the trial court's finding that Brady came voluntarily to the police station for his interview. The record shows that the total time of this interrogation was a little over forty-five minutes. Mitchell also tells Brady at the beginning of the interview that he is not under arrest, he does not have an arrest warrant, and he is free to leave. Approximately one-third of the way through the interview, Mitchell reads Brady his Miranda warnings, which Brady signs indicating he understands his rights. Mitchell, however, makes it clear to Brady they are talking about a crime, and "we need to process everything because I've got to go over everything before this thing because I have to know on my part what I'm working with[.]" The video of the interview shows no evidence that Brady ever asked for an attorney, or to speak with or call his family, and he never asked for food or drink, nor is there any indication that he was sleep deprived. There is no allegation of and no evidence showing that he was physically restrained during the interview; in fact, the only evidence indicates he was not restrained. Although Brady says a

21

couple of times that what happened is hard to talk about, and that he does not want to talk about it any further, he does not get up and leave at that point. The video indicates that Mitchell tells Brady, "I have enough[,]" but he then allows Brady to leave the police station. Mitchell did not obtain an arrest warrant until March 10, which was weeks after the interview occurred.

Using a de novo standard of review for the trial court's legal conclusion that this was a custodial interrogation to which *Miranda* applied, we conclude, based on the consideration of "other circumstances" that no reasonable person would believe he was under restraint to the degree associated with an arrest. *See Saenz*, 411 S.W.3d at 496; *Gardner*, 306 S.W.3d at 294–95; *Dowthitt*, 931 S.W.2d at 255; *see also Howes*, 565 U.S. at 509; *Stansbury*, 511 U.S. at 325. We hold Brady failed to meet his burden at the suppression hearing of establishing that this was a custodial interrogation. *See Herrera*, 241 S.W.3d at 526. Having determined that this was a noncustodial interrogation, the State had no obligation to instruct Brady and obtain waivers as to *Miranda* or 38.22. *See Herrera*, 241 S.W.3d at 526.

**Invocation of Right to Remain Silent**

Under *Miranda*, police officers must respect a suspect's unambiguous invocation of his right to remain silent by terminating questioning; such a request must be "scrupulously honored" and all questioning must cease. *See Sandoval v. State*, 665 S.W.3d 496, 520 (Tex. Crim. App. 2022) (quoting *Michigan v. Mosley*,

423 U.S. 96, 103–04 (1975)). "If a statement is governed by *Miranda* (i.e., the suspect is in custody), then a failure to cut off questioning after a suspect invokes his right to remain silent violates his rights and renders any subsequently obtained statements inadmissible." *Dowthitt*, 931 S.W.2d at 257 (citation omitted). "However, if a suspect's invocation of this right is not unambiguous, a law enforcement officer is not required to cease questioning or to clarify an ambiguous remark, although the latter is good practice." *State v. Robles*, 720 S.W.3d 546, 555 (Tex. App.—El Paso 2025, pet. ref'd) (citing *Davis v. United States*, 512 U.S. 452, 461 (1994) (recognizing that although not required, "it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney" "when a suspect makes an ambiguous or equivocal statement"); *Sandoval*, 665 S.W.3d at 520 (recognizing that "a suspect's invocation of this right must be unambiguous, and there is no requirement that law enforcement clarify ambiguous remarks")). We look at the totality of the circumstances to determine whether the defendant unambiguously invoked his right to remain silent. *Id.* (quoting *Watson v. State*, 762 S.W.2d 591, 597 (Tex. Crim. App. 1988)).

The Court of Criminal Appeals has said,

If the individual [in custody] indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. As this language [in *Miranda* ] suggests, the suspect need not use any particular phraseology to invoke the right [to remain silent]. [A]ny declaration of a desire to terminate the contact or inquiry ... should suffice. The same is true of silence in the face of

23

repeated questioning, or an effort to end the contact with the interrogator. But, an [interrogating] officer need not stop his questioning unless the suspect's invocation of rights is unambiguous, and the officer is not required to clarify ambiguous remarks. If a person in custody does invoke his Fifth Amendment right to remain silent, then the admissibility in court of statements obtained thereafter depends on whether the person's right was "scrupulously honored."

*Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008) (internal quotations and citations omitted); *see also Robles*, 720 S.W.3d at 555 (citations omitted).

When an appellant is not in custody, however, law enforcement officials have no obligation under *Miranda* to scrupulously honor a request to terminate questioning in a non-custodial encounter. *Estrada v. State*, 313 S.W.3d 274, 296 (Tex. Crim. App. 2010) (citations omitted). When *Miranda* warnings were unnecessarily given, it does not change that fact. *See id.* A defendant's remedy in a noncustodial setting where the police continue questioning him after he "has unambiguously invoked his right to silence is simply to get up and leave." *See id.* at 296 n.26 (citations omitted).

We have already concluded that Brady failed to establish that his interview was custodial, and his remedy if he wanted to stop talking was simply to get up and leave which he eventually did. Therefore, we hold that Mitchell had no obligation to "scrupulously honor" Brady's request to stop talking or to remain silent despite the gratuitous reading of the *Miranda* warning. *See id.* at 296 (citations omitted). The trial court's conclusion that Brady indicated he wanted to terminate the interview

24

and that he had invoked his right to remain silent which the officers did not "scrupulously follow," was erroneous, and the trial court's suppression of the portion of that interview following that invocation was also erroneous.

Having determined that Brady failed to establish his interview was custodial and that Mitchell had no obligation to "scrupulously honor" Brady's desire to terminate the interview, we sustain issue one.

## ISSUE TWO: VOLUNTARINESS

In issue two, the State contends the trial court erred by concluding Brady's statement was involuntary. We focus our discussion in this issue on the arguments Brady made at trial wherein he asserted that the aggressive interrogation and psychological tactics made the statements involuntary. Specifically, Brady argues: (1) Mitchell's suggestion that confessing might help if Brady "got it off his chest," presented against the backdrop of a wide range of punishment and might "earn the right to see his family;" and (2) Mitchell shaming Brady by suggesting that he could save a child from testifying.

Consent issues are "necessarily fact intensive" thus, "a trial court's finding of voluntariness must be accepted on appeal unless it is clearly erroneous." *Meekins v. State*, 340 S.W.3d 454, 460 (Tex. Crim. App. 2011). We afford the prevailing party in the trial court "'the strongest legitimate view of the evidence and all reasonable

inferences that may be drawn from that evidence.'" *Id.* (quoting *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008)).

A statement can be deemed "involuntary" under three separate theories: (1) failure to comply with code of criminal procedure article 38.22; (2) failure to comply with the dictates of *Miranda*; or "(3) it was taken in violation of due process or due course of law because the statement was not freely given due to coercion, force, or improper influence." *State v. Howard*, 378 S.W.3d 535, 541 (Tex. App.—Fort Worth 2012, pet. ref'd) (citing *Wolfe v. State*, 917 S.W.2d 270, 282 (Tex. Crim. App. 1996)) (other citations omitted). We addressed *Miranda* in issue one above, and in that analysis noted that article 38.22 likewise applies only to custodial interrogations. *See id.*; *see also* Tex. Code Crim. Proc. Ann. art. 38.22; *Gardner*, 306 S.W.3d at 294. Therefore, for us to affirm the trial court's ruling based on Brady's claims that his statements were involuntary, the record must reasonably support the conclusion that Brady's statements were not freely given due to coercion, force, or improper influence. *See Howard*, 378 S.W.3d at 541; *see also Wolfe*, 917 S.W.2d at 282 (explaining that in the absence of custody, due process is violated only by confessions that are not freely given rather than by mere noncompliance with prophylactic rules). "To prevail on a due process 'involuntary confession' claim, a defendant must show (1) that police engaged in activity that was objectively coercive, (2) that the statement is causally related to the coercive government misconduct, and

(3) that the coercion overbore the defendant's will." *Lopez v. State*, 610 S.W.3d 487, 494 (Tex. Crim. App. 2020) (citing *Colorado v. Connelly*, 479 U.S. 157, 170 (1986); *Contreras v. State*, 312 S.W.3d 566, 574 (Tex. Crim. App. 2010); *Oursbourn v. State*, 259 S.W.3d 159, 170–71 (Tex. Crim. App. 2008)). To determine whether a confession was voluntary we examine the totality of the circumstances. *See id.*; *Delao v. State*, 235 S.W.3d 235, 239 (Tex. Crim. App. 2007).

"A promise made by a law enforcement officer may render a confession involuntary if it was positive, made or sanctioned by someone with apparent authority, was of some benefit to the defendant and was of such a character as would likely cause a person to speak untruthfully." *Joseph v. State*, 309 S.W.3d 20, 26 n.8 (Tex. Crim. App. 2010) (citing *Garcia v. State*, 919 S.W.2d 370, 388 (Tex. Crim. App. 1994)). "General promises of leniency, such as the officer's statement that an appellant's cooperation by giving a statement would 'help' the accused do not reach the required level for improper inducement." *Coleman v. State*, 440 S.W.3d 218, 225 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (citing *Dykes v. State*, 657 S.W.2d 796, 797 (Tex. Crim. App. 1983)).

Amorphous references in the recorded statement that it might help Brady if he "got things off his chest" or that a jury or prosecutor might be more lenient if he were honest, does not rise to the level of improper inducement. *See id.* Likewise, any appeals to Brady's concern for the victim and sparing her the ordeal of testifying did

not rise to this level of coerciveness. As explained in our discussion of issue one: Brady came to the police station voluntarily; the interview lasted less than an hour; he was told more than once he was free to leave; despite not signing a waiver of his *Miranda* rights, he signed a statement indicating he understood them and did not get up to leave the noncustodial interrogation until it ended; he was not under arrest; he was allowed to leave the police station; and an arrest warrant was not obtained for weeks after the interview. Based on the totality of the circumstances, we conclude the record does not reflect that Brady's will was overborne as a result of Mitchell's comments so as to render Brady's statements involuntary. *See Lopez*, 610 S.W.3d at 494; *Contreras*, 312 S.W.3d at 574; *Oursbourn*, 259 S.W.3d at 170–77. We sustain issue two.

## CONCLUSION

We conclude the trial court erred in granting the Motion to Suppress and have sustained the State's issues. Accordingly, we reverse the trial court's order and remand the case to the trial court for further proceedings.

REVERSED AND REMANDED.

W. SCOTT GOLEMON
Chief Justice

Submitted on August 25, 2025
Opinion Delivered February 18, 2026
Do Not Publish
Before Golemon, C.J., Johnson and Wright, JJ.